**RECEIVED**
5/5/2020
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

JUDGE PALLMEYER
MAGISTRATE JUDGE JENSEN

United States District Court
Northern District of Illinois

Joseph Vansach
* Plaintiff and Petitioner *

**20CV50180**

VS.

Case No.
(To be supplied by Clerk of the Court)

#1 Department of Justice, #2 Federal Bureau of Investigations, #3 Federal Bureau of Prisons, #4 United States Penitentiary Thomson, #5 County of Carroll, #6 Village of Thomson, #7 F.B.O.P Director Kathleen Hawk, #8 Former F.B.O.P. Director Hugh J. Hurcuitz #9 North Central Regional Director J.E.Krueger, #10 F.B.I. Agent C. Awender, #11 U.S.P. Thomson Warden Rivers, #12 Former U.S.P. Thomson Warden Hudson, #13 S.I.A. Hansen, #14 S.I.S. Cruze, #15 DHO Ingram, #16 DHO Secretary Fletcher, #17 Unit Manager Moesh, #18 Case Manager D. Dwyer, #19 Counselor Vonopdorp, #20 Case Manager Wood, #21 Counselor Broton, #22 Lt. Bette, #23 Lt. D. Murton, #24 Lt. Erskine, #25 C/O Heim, #26 C/O Shomo, #27 C/O Nayda, #28 C/O M. Young, #29 C/O Gamble, #30 C/O Kaufman, #31 C/O Masters, #32 C/O Goyces, #33 C/O A. LaShelle, #34 C/O L. Stringer, #35 C/O Abertson, #36 C/O H. Boussag, #37 C/O B. Mullins #38 C/O K. Maybury, #39 RN L. Starr, #40 RN M. Bergmann, #41 RN Vanessa Garcia

* Defendants and Respondants *

In Re: ⊛ Civil Complaint ⊛
Pursuant to 42 U.S.C. § 1983, The First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution

This is Presently a Pro Se Action brought by the Plaintiff and Petitioner, Housed at Administrative United States Penitentiary Thomson, with only paper, flex pens, stamps, legal Envelopes, envelopes and hopefully access to legal Copies from the Education department. This Pro Se Plaintiff and Petitioner is seeking declaratory and injunctive relief, compensatory damages and punitive damages, against the named Defendants, for rights Violations of Rights guaranteed under the law of the United States and for personal, Psychological and other Rights and injuries in Violation of the State of Illinois, County of Carroll and Village of Thomson.

I. * Jurisdiction and Venue *

1. This Action is brought pursuant to 42 U.S.C. § 1983, The First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, pursuant to 28 U.S.C. §§ 1331 and 1343(3),(4).

2. Jurisdiction lies over State law Claims based on Supplemental Jurisdiction as Codified at 28 U.S.C. § 1367.

3. All Claims arose within the Jurisdiction of the Judicial District of The State of Illinois, County of Carroll and Village of Thomson, and involves mostly Defendants who work and reside within the Jurisdictional Boundaries. Venue is Proper Under 28 U.S.C. § 1391(b) and (c).

4. This Action involves the Constitutional Rights of Prisoners § 3.2 Degree of Force Permitted, § 3.8 The Use of Corporal Punishment to enforce Prison Discipline, § 5.3 Communications with the Courts, § 5.6 Communications with News Media, § 6.3.4 Punishment Proportional to the offense, § 8.12 Retaliation for Exercising Constitutional Rights, § 11.8 Retaliation Claims, § 13.6 Civil Suits against State and Federal Prison Officials, § 14.5 Exhaustion of Remedies, § 14.5.4 Multiple Claims, § 14.6 Injuries and § 14.6.2 Deminimis injuries.

Page 1 of 33

5. This Action brought also involves Physical Beatings, Assaults and Tortures by Correctional officers unrelated to security or Discipline, where the Plaintiff was Assaulted, beaten and tortured by Multiple Correctional officers, Multiple Times, on occassions separate from one Another, leaving the Plaintiff with Psychological injuries as well.

6. This Action Brought also involves unnecessary and Wanton infliction of Pain (Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392 (1981) where Wanton means Senseless, unprovoked, unjustifiable or deliberately malicious, this test looks at the Intent and Intentions of the officers and officials.

■. This Action brought also involves Maliciously and Sadistically for the very Purpose of Causing pain and harm (Whitley v. Albers, 475 U.S. 312, 106 S.Ct. 1078, (1986), which makes an exception to deliberate indifference standards within limits. In this Case, it went on to say that officers would be inflicting Cruel and Unusual Punishments even in emergencies and if they acted maliciously and sadistically, for Purpose of Causing pain and harm. That standard is the bottom line of Cruel and Unusual Punishment. Any unnecessary Sadistic injuries are violations of the Law in any Condition.

■. This Action brought also involves Deliberate indifference and medical neglect (Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 292 (1976) which reads that in medical problems, acts and omissions sufficiently harmful to evidence deliberate indifference To Serious Medical needs, constitutes, Cruel and Unusual punishment. The deliberate indifferent Standard is now being applied to define other Kinds of Cruel and Unusual Punishments. Like Concealing injuries to an inmate who suffered the injuries from staff assaults and not noting the injuries in the Victims medical file is deliberate indifference with Malicious intent and this test looks at the medical staff members and the medical officials intentions.

## II * Parties Involved *

7. Plaintiff and Petitioner, Joseph, Theodore Vansach, is a adult male residing in Administrative United States Penitentiary Thomson. Is currently an inmate under the name of Joseph VanSach, Register Number 17041-424, and was born in Chicago, Illinois, Grant Hospital, on August 10th, 1972, to Laura Barbara Strompolis, Born January 17th, 1947 and died May 10th, 1993, and to George Allen Vansach, born February 22nd, 1951 and died May 19th, 2008.

8. Defendant #1 Department of Justice is a governmental Entity with Controling Factors over two other branches of governmental Entities in Defendants #2 Federal Bureau of Investigations and #3 Federal Bureau of Prisons. The Department of Justice, over the period of time, these Criminal and Civil offenses occured, was responsible for being Chief Policy Maker over Defendants #2 Federal Bureau of Investigations and #3 Federal Bureau of Prisons. The Department of Justice is being sued in it's official Capacity and as a governmental Entity. At all times relavant to this Action, The Department of Justice was acting under the Color of Federal, State, County and Village law, as the Policy Maker over Defendants #2 Federal Bureau of Investigations and #3 Federal Bureau of Prisons, In the State of Illinois, County of Carroll and Village of Thomson.

9. Defendant #2 The Federal Bureau of Investigations, is a governmental Entity, with Controling Factors over it's Federal Agents, Including, but not limited to, Defendants #10 F.B.I. Agent C. Awender and #13 S.I.A. Hansen. The Federal Bureau of Investigations, over the period of time, these Criminal and Civil offenses occured, was Responsible for being Chief Policy maker over their agents which includes Defendants #10 F.B.I. Agent C. Awender and #13 S.I.A. Hansen. The Federal Bureau of Investigations is being sued in it's official Capacity and as a governmental Entity. At all times relavant to this Action, The Federal Bureau of Investigations, was acting under the Color of Federal, State, County and Village law, as the Policy Maker over Defendants #10 F.B.I. Agent C. Awender and #13 S.I.A. Hansen, In the State of Illinois, County of Carroll and Village of Thomson.

10. Defendant #3 The Federal Bureau of Prisons, is a governmental Entity, with Controling Factors over it's Central office, North Central Regional office, Defendants #4 United States Penitentiary Thomson, #7 F.B.O.P. Director Kathleen Hawk, #8 Former F.B.O.P. Director Hugh J. Hurwitz, #9 North Central Regional office Director J.E. Krueger, #11 U.S.P. Thomson Warden Rivers, #12 Former U.S.P. Thomson Warden Hudson, #S.I.S. Cruze, #15 DHO Ingram and #16 DHO Secretary

Fletcher. The Federal Bureau of Prisons is being sued in it's Official Capacity and as a governmental Entity. At all times Relevant to this Action, The Federal Bureau of Prisons was acting under the Color of Federal, State, County and Village Law, as Policy Maker over Defendant's #4, #7, #8, #9, #11, #12, #14, #15 and #16, in the State of Illinois, County of Carroll and Village of Thomson.

11. Defendant #4 United States Penitentiary Thomson is a governmental Entity, with Controlling Factor's over it's Personel it employ's, which include, but are not limited to #11 U.S.P. Thomson Warden Rivers, #12 Former U.S.P. Thomson Warden Hudson, #14. S.I.S. Cruze, #17 Unit Manager Moesh, #18 Case Manager D. Dwyer, #19 Counselor Youngdorp, #20 Case Manager Wood, #21 Counselor Groton, #22 Lt. Beehle, #23 Lt. D. Morton, #24 Lt. Erskine, #25 C/O D. Heim, #26 C/O Shomo, #27 C/O Nayda, #28 C/O M. Young, #29 C/O Bamble, #30 C/O Kaufman, #31 C/O Mostert, #32 C/O Gaynes, #33 C/O A. Lashelle, #34 C/O L. Stringer, #35 C/O Albertson, #36 C/O H. Boussio, #37 C/O B. Mullins, #38 C/O K. Maybury, #39 RN L. State, #40 RN M. Bergmann and #41 RN Vanessa Garcia. United States Penitentiary, is being sued in it's Official Capacity and as a governmental Entity. At all times relavant to this Action, United States Penitentiary Thomson was acting under the Color of Federal, State, County and Village Law, as Policy Maker over Defendants #11, #12, #14, #17, #18, #19, #20, #21, #22, #23, #24, #25, #26, #27, #28, #29, #30, #31, #32, #33, #34, #35, #36, #37, #38, #39, #40 and #41, in the State of Illinois, County of Carroll and Village of Thomson.

12. Defendant's #5 County of Carroll and #6 Village of Thomson are Jurisdictional law elements of the Actual Location of #4 United States Penitentiary Thomson resides in. While United States Penitentiary Thomson's Correctional officers, Staff members, and officials working as employee's, out of The Prison, United States Penitentiary Thomson, they are under the Umbrella of the County of Carroll and Village of Thomson's Laws, Rules and Regulations. So when these United States Penitentiary Thomson Employee's Violate the Jurisdictional laws, Rules and Regulations of the County of Carroll and Village of Thomson, these individual's are under the Color of Law of the local County government and local Village government. So Defendants #5 County of Carroll and #6 Village of Thomson, Knowingly, or should have Known, the Staff members, Correctional officers and official's of United States Penitentiary Thomson, were Committing Criminal and Civil offenses against it's Inmate population; means anybody Committing these Criminal and Civil offenses, are under the County government and Village government Umbrella, and acting on the behalf of the local County government of Carroll County and local Village government of the Village of Thomson's laws, Rules and Regulations. Considering the Prison itself, United States Penitentiary Thomson, is located in Thomson, Illinois, and United States Penitentiary Thomson is a branch of the Federal Bureau of Prisons, which is another branch of the Department of Justice and the Department of Justice had another branch of their entity in the Federal Bureau of Investigations, all working out of United States Penitentiary Thomson, who were are working in Joint Union out of The Prison, and are all government entities and government agencies, functioning under the Umbrella of the County of Carroll local government and under the Umbrella of the Village of Thomson local government. Therefore, The acts and policies of the County and Village government are, in effect, the acts and policies of all those working out of United States Penitentiary Thomson. Defendants #5 County of Carroll and #6 Village of Thomson, are being Sued in their official Capacity and as the local governmental entities of United States Penitentiary Thomson. At All times relavant to this Action, The County of Carroll and Village of Thomson, were acting under the Color of Federal, State, County and Village laws, Rules and Regulations, as Policy Maker over Defendants #1, #2, #3 and #4, in the State of Illinois, County of Carroll and Village of Thomson.

13. Defendants #7 F.B.O.P. Director Kathleen Hawk and #8 Former F.B.O.P. Director Hugh J. Hurwitz were the Directors of the Federal Bureau of Prisons over the Period of Time these Criminal and Civil offenses occured at United States Penitentiary Thomson and were responsible for being Chief Policy Makers over the Federal Bureau of Prisons, including, United States Penitentiary Thomson. Defendants #7 F.B.O.P. Director Kathleen Hauk and #8 Former F.B.O.P. Director Hugh J. Hurwitz are being sued in their individual and official Capacities. At all times Relavant to this Action, The Acting Director was acting under the Color of Federal, State, County and Village laws, as Director over The Prison United States Penitentiary Thomson, located in the State of Illinois, County of Carroll and Village of Thomson.

14. Defendant #9 North Central Regional Office Director J.E. Krueger, is the Director of the North Central Regional Office, over the period of time these Criminal and Civil offenses occured, and Known, or Should have Known, and been responsible for, being the Policy Maker and enforcer over the North Central Regional Boundries, which includes, Defendant #4 United States Penitentiary Thomson, in Thomson, Illinois. Defendant #9 North Central Regional Director J.E. Krueger, is being sued in his individual and official Capacity. At all times Relevant to this Action, the acting Regional Director was acting under the Color of Federal, State, County and Village laws, as the Regional Director over the Prison of United States Penitentiary Thomson, located in the State of Illinois, County of Carroll and Village of Thomson.

15. Defendants #11 U.S.P. Thomson Warden Rivers and #12 Former U.S.P. Thomson Warden Hudson, were the warden's over the Period of time these Offenses occured and were Responsible for Defendants #14 S.I.S. Cruze, #17 Unit Manager Moesh, #18 Case Manager D. Dwyer, #19 Counselor Yanopdoro, #20 Case Manager Wood, #21 Counselor Broton, #22 Lt. Behle, #23 Lt. D. Murton, #24 Lt. Ecskine, #25 C/O. Heim, #26 C/O Shomo, #27 C/O Nayda, #28 C/O M. Young, #29 C/O Gamble, #30 C/O Kaufman, #31 C/O Mostert, #32 C/O Goyces, #33 C/O A. LaShelle, #34 C/O L. Skinger, #35 C/O Albertson, #36 C/O H. Boussag, #37 C/O B. Mullins, #38 C/O K. Maybury, #39 RN L. Starr, #40 RN M. Bergmann and #41 RN Vanessa Garcia, and Responsible for being the Policy Maker over all these above mentioned Defendants and other employees working out of United States Penitentiary Thomson, in Thomson, Illinois. Defendants #11 U.S.P. Thomson Warden Rivers and #12 Former U.S.P. Thomson warden Hudson, are being sued in their individual and official Capacities. At all times Relevant to this Action, the acting warden was acting under the Color of Federal, State, County and Village laws, as the Warden of United States Penitentiary Thomson, The Prison, located in the State of Illinois, County of Carroll and Village of Thomson.

16. Defendants #10 F.B.I. Agent C. Awender, #13 S.I.A. Hansen, #14 S.I.S. Cruze, #15 DHO Ingram, #16 DHO Secretary Fletcher, #17 Unit Manager Moesh, #18 Case Manager D. Dwyer, #19 Counselor Yanopdoro, #20 Case Manager Wood, #21 Counselor Broton, #22 Lt. Behle, #23 Lt. D. Murton, #24 Lt. Ecskine, #25 C/O D. Heim, #26 C/O Shomo, #27 C/O Nayda, #28 C/O M. Young, #29 C/O Gamble, #30 C/O Kaufman, #31 C/O Mostert, #32 C/O Goyces, #33 C/O A. LaShelle, #34 C/O L. Skinger, #35 C/O Albertson, #36 C/O H. Boussag, #37 C/O B. Mullins, #38 C/O K. Maybury, #39 RN L. Starr, #40 RN M. Bergmann and #41 RN Vanessa Garcia are all being sued under the personal Capacity Suit. These Personal Capacity Suits Seek Punitive damages, Seeking to impose personal liability upon a government official or Correctional Staff member, for their Actions taken under the Color of Federal, State, County and Village laws, for Violating rights protected by the Constitution or a Federal Statute. An award against an official or Correctional Staff member in his or her personal Capacity, can be enforced only against the official's or Correctional Staff members Current assets and future income, and not the assets of the government Entity. As to defenses of liability, an official or Correctional Staff member, in a personal Capacity Suit, May, depending on his or her position, be able to assert personal immunity defenses, such as, objectively reasonable reliance on existing law. In which, there is nothing the Plaintiff Could find So far, as by law, that would give ammunity to Defendants #10, #13, #14, #15, #16, #17, #18, #19, #20, #21, #22, #23, #24, #25, #26, #27, #28, #29, #30, #31, #32, #33, #34, #35, #36, #37, #38, #39, #40 and #41, which means all thirty (30) of these defendants are eligible to be "Sued for" punitive damages under the Personal Capacity Suit.

## III. * Statement of Facts *

17. The following Paragraphs, are a timeline discription of this Civil Complaint and Action by this Plaintiff and Petitioner, involving the forty-one (41) defendants mentioned in this Complaint and the Repeated Violations of the Plaintiff's Civil Rights, Constitutional rights, Constitutional rights of Prisoners and Americans with Disabilities Act of 1974, by these forty-one (41) mentioned defendants.

18. From the beginning, I Joseph Vansach, Register number 17041-424, the Plaintiff and petitioner, was transfered into Administrative United States Penitentiary Thomson February 26th, 2019, in the State of Illinois County of Carroll and Village of Thomson.

19. Upon the Plaintiff's arrival, the Plaintiff was notified that the Plaintiff's Criminal Case No. 17-8740 in the Supreme Court of the United States was just Granted with a reverse and remmand, back to the Seventh Circuit Court of Appeals for Reconsideration.

**20.** When transferring from United States Penitentiary McCreary, through Oklahoma City, Oklahoma, Transit Center, to get to United States Penitentiary Thomson, the Plaintiff was told he could not travel with his legal material or medical equipment, which was already mailed and should be at United States Penitentiary Thomson with the rest of the Plaintiff's personal property, by the time he gets there.

**21.** The Plaintiff has several chronic care medical conditions that are well documented in the Plaintiff's medical file over the years, which includes some medical equipment needed for the plaintiff's medical problems. Those medical equipment include medical shoes and a medical brace, for the plaintiff has the amputation of his great left toe on his left foot, Psoriatic Arthropathy of his left ankle and the third and fourth toes on the Plaintiff's left foot are becoming deformed with hammer toe, causing him to walk on them occasionally when he walks. These medical conditions cause both stability and balance problems with the Plaintiff, and makes it hard and painful for the plaintiff to walk up and down stairs, to walk backwards and to spin or move quickly to his left without causing some sort of pain and discomfort, in his left ankle. Plaintiff also has Psoriatic Arthritis and a hernia above his belly button, which the plaintiff needs an abdominal binder for to keep it in place, so it don't get worse. The Plaintiff also suffers from severe hearing loss, and only has ten percent of his hearing left in his left ear and seventy-five percent of his hearing left in his right ear and needs hearing amplifiers to hear and comprehend conversations properly.

**22.** A few days after Plaintiff's arrival at United States Penitentiary Thomson, the prison Chaplin came to the Plaintiff's cell and brought him his Native American Prayer Feather and medicine bag that was mailed to United States Penitentiary Thomson with the rest of the Plaintiff's personal property. Once the Plaintiff received his Religious items from the Chaplin, he knew the rest of his personal property, legal material and medical equipment was here in United States Penitentiary Thomson as well.

**23.** After four weeks of being in United States Penitentiary Thomson and being denied access to his legal material and medical equipment, Plaintiff went on a hunger strike and quit eating until they gave him his legal material and medical equipment. The Hunger strike started Thursday morning, March 21st, 2019, where video surveillance will show the Plaintiff refused his breakfast tray in Cell EO2-228, but United States Penitentiary Thomson staff members refused to take notice until after the Plaintiff refused his ninth meal, Saturday, March 23rd, 2019, after the 4:00 p.m. Institutional count, when dinner trays were served.

**24.** Then Defendant #22 Lt. Behle had the Plaintiff moved from his Cell EO2-228 on Echo Two Unit to Cell EO1-136 on Echo one Unit, to house the plaintiff by himself while the Plaintiff was on hunger strike. During the process of moving the plaintiff, #22 Lt. Behle ordered S/o Cundiff to remove three bags of Keefe Coffee from the plaintiff's personal property, which were never given back to the plaintiff in retaliation for the Plaintiff going on hunger strike. The Plaintiff went on hunger strike to get his legal material and medical equipment he was entitled to, there was no reason for #22 Lt. Behle to retaliate against the plaintiff for exercising his rights in a peaceful and humble manner, by stealing the plaintiff's three bags of coffee the plaintiff purchased in Commissary.

**25.** Eventually, the Plaintiff was told on Sunday morning, March 24th, 2019, that the staff would talk to the property officer monday, to get the plaintiff his legal material and talk to medical about getting approval for the plaintiff's medical equipment to be issued to him from his personal property.

**26.** On Sunday afternoon, March 24th, 2019, at around 1:00 p.m., RN Diane Sweeney, did a hunger strike evaluation at the S.M.U. Lt. Request ✱ See: Plaintiff's medical file ✱

**27.** On Monday afternoon, March 25th, 2019, at around 8:10 p.m., RN Chasity Bungard did a hunger strike evaluation on the Plaintiff and spoke to him, while she assessed the Plaintiff for continuing his hunger strike. RN Chasity Bungard, explained to the plaintiff, that she spoke to the Doctor about the Plaintiff's medical equipment and the Doctor authorized for the Plaintiff to receive his medical shoes and hearing aids from his personal property based on the plaintiff's medical file. She explained that the plaintiff's other medical equipment he needs were under medical service review so the Plaintiff could have access to all his much needed medical equipment ✱ See: Plaintiff's medical file ✱

**28.** Shortly after RN Bungard's visit to the plaintiff, S.M.U. Lt. sent word through a Correctional officer, that he was sending the property officer an e-mail, to give the Plaintiff his legal material, when the property officer gets the Plaintiff's medical equipment out of his personal property.

29. After the 4:00 p.m Institutional Count, on Monday, March 25th, 2019, The Plaintiff slowly came off hunger strike and took about 90 minutes to consume his dinner tray which was reported to the S.M.U. Lt. and #40 RN M. Bergmann by Correctional officers.

30. Video Surveilence from the Institutional Camera's will show, shortly after the Plaintiff consumed his dinner tray, several officers and a couple of Lieutenants came to the Plaintiff's cell door at EO1-136 and told the Plaintiff to pack his personal property, he was moving back to cell EO2-228 on Echo two Unit, where the Plaintiff came off from. So the Plaintiff packed his belongings and was escorted by a large group of officers and several Lieutenants from cell EO1-136 to Echo two Unit, allegedly to be placed back in his cell he came from.

31. Upon entering Echo two Unit that evening, of March 25th, 2019, Video Surveilence will show it was first explained to the Plaintiff, by some officers and a Lieutenant, that the Plaintiff was being placed in hard Ambulatory Restraints for going on hunger strike. Another Lieutenant and several other officers argued the Plaintiff didn't do nothing violent to be placed in hard Ambulatory Restraints, but to place the Plaintiff in Soft Ambulatory restraints for going on hunger strike. The few remaining officers and the Plaintiff started arguing that the Plaintiff did nothing wrong to be placed in restraints, that the Plaintiff should be placed back in the cell he came from. The plaintiff was first put in Hard Ambulatory restraints, then Soft Ambulatory Restraints, both took place by the downstairs shower area of Echo two, when they finally did a football huddle off to the side, the decision to take the Plaintiff out of Soft Ambulatory Restraints and put him back in his cell EO2-228.

32. Then a few days later, on Monday, April 1st, 2019, #22 Lt. Behle and Lt. Ramirez came to the Plaintiff's cell at EO2-228 and told him, he was being moved back to Echo one Unit, with one of his own people. Being the Plaintiff is a Latin King Street gang member, he packed his personal property and agreed to be moved back to Echo one Unit with one of his own Latin King Street gang members.

33. Upon the Plaintiff's arrival in echo one, plaintiff was moved into cell EO1-143 and locked into a cell with one of his known enemies to his group, causing a hostile enviroment between the Plaintiff and this other individual. Shortly afterwards, the other Inmate gave an officer a cop-out through the door, officers came right back and removed the inmate from the cell and took him to the shower cage and locked him in it. The C/o Cundiff and #25% D.Heim came back to Cell EO1-143 Cell door and spoke to the Plaintiff about if there would be a problem with the Plaintiff living with this known enemy of his group, that he could not live with his own people because he told on them. Plaintiff complained that there would be a problem, that he could not live with his known enemy and he could not live with an Inmate who told on his own people. The other Inmate complained from the shower, that he was in fear of getting assaulted by the Plaintiff and the officers and Lieutenants were setting him up to get assaulted.

34. After the other inmate refused to come back to the cell until they moved the Plaintiff, C/o Cundiff had the Plaintiff moved to cell EO1-138 on Echo one Unit and, a few hours later, moved Inmate Carmen Grieco # 54747-066 into the cell with the Plaintiff, because they were cellmates, up until the Plaintiff was transfered from United States Penitentiary McCreary, to United States Penitentiary Thomson, February 20th, 2019.

35. On Tuesday, April 2nd, 2019, at around 8:00 a.m., still without the Plaintiff receiving his legal material and medical equipment, and the Plaintiff again complaining about the institutional staff lying to him about how he would get his legal material and medical equipment the next day and it was now a week since he came off hunger strike. #25% D. Heim and #38% K.Maybury, came to the Plaintiff's Cell door at EO1-138 and told the Plaintiff and Mr.Grieco to get ready for showers. Because the Plaintiff and Mr.Grieco knew they only get three showers per week in the Special management Unit, they both got ready and stood at their cell door.

36. A few minutes later, #25% D.Heim and #38% K.Maybury came to the cell door at EO1-138 to Escort Plaintiff and Mr.Grieco to the shower from their cell. After cuffing up the Plaintiff and Mr.Grieco from the food slot, the officers called on the radio to Control to have them open the cell door. Once the cell door was opened, #38 C/o K.Maybury took Mr.Grieco off to the side, to the left of the door and then the Plaintiff started to come out backwards awkwardly with #25 C/o D.Heim because of his medical disability with his left foot. #25 C/o D.Heim said in a hostile manner "walk straight back" and the Plaintiff replied "I can't, I have a medical problem with my left foot, if you read the permit on the door, it will explain that to you" #25 C/o D. Heim said "if you want a shower, you will walk straight backwards" and the Plaintiff replied "if you read the medical permit on the door, you will see I have a medical problem."

#25 C/o D. Heim said to #38 C/o K. Maybury "he's not getting a shower, he's being an asshole" and #25% D. Heim pushed the Plaintiff towards the Cell and into it, then Calling on the radio to close the Cell door. The Plaintiff Complained to #25 C/o D. Heim that he was being denied a shower because of his medical disability and #25 C/o D. Heim continued to not allow Plaintiff a shower unless he could walk perfectly backwards.

**37.** The Plaintiff continued to ask several times from behind his locked Cell door at EO1-138 to #25% D. Heim and #38% K. Maybury about a shower and #25% D. Heim said "your not getting a shower until you learn to walk perfectly backwards" After the Plaintiff continued to plead with #25% D. Heim about getting a shower, #25% D. Heim just walked away. Plaintiff Complained to #22 Lt. Behle, #26 C/o Shomo, #27 C/o Nayda, #38% K. Maybury C/o Cundiff and Psychology Ms. Levy about getting a shower and how his Plaintiff was being denied a shower because of his medical disability. Defendants #22, #26, #27 and #38 continued to show deliberate indifference to the Plaintiff's medical disability and sided with #25 C/o D. Heim to unjustly deny Plaintiff a shower because of his limitations with his left foot. The issue was a violation of the Plaintiff's Rights and the springboard that led to retaliations of excessive force, beatings, assaults and tortures the Plaintiff had received since this occured.

**38.** After being told by #22, #25, #26, #27 and #38 that the Plaintiff was not getting a shower until the next time they do showers in two days. when the officers brought back Plaintiff's Celly Mr. Grieco from the shower, The Plaintiff refused to take Mr. Grieco back into the Cell until they allowed the Plaintiff to take a shower. The Plaintiff never disrespected or threatened those officers, all the Plaintiff did was request a shower over and over again. The officers took Mr. Grieco back to the shower area and locked him in a shower cage, then the officers threatened to suit up a force team to remove the Plaintiff from the Cell, for refusing to take Mr. Grieco back into the Cell until they gave the Plaintiff a shower.

**39.** While the Plaintiff waited for the force team to come back, the Plaintiff wrote up five Administrative Remedy Forms and was also waiting for Unit team members to do rounds to pick them up. You can see on Video Surveilence, #26 C/o Shomo came back to Cell EO1-138 to talk to the Plaintiff and the Plaintiff asked to speak to a Lieutenant, #26% Shomo said "I am a Lieutenant, what's the problem with you?" and the Plaintiff explained to #26 C/o Shomo about being denied a shower because of the Plaintiff's disability and explained to #26 C/o Shomo he wrote up five Administrative Remedy BP-8 forms, including the one he wrote about #25% D. Heim denying the Plaintiff a shower because of a disability, #26 C/o Shomo said "let me get that BP-8 form about the shower and I'll take care of it for you, but your not getting a shower today, we are suiting up a force team for you". The Plaintiff handed #26% Shomo the BP-8 Form pertaining to #25 C/o D. Heim and you can see on Video Surveilence, #26 C/o Shomo takes the BP-8 form, the Plaintiff passed through the Cell door and he stuffs it into his security Vest and walks away.

**40.** About ten or fifteen minutes later, after #26 C/o Shomo left the Plaintiff's cell at EO1-138, you can see on Video Surveilence, Counselor Samuel comes around the range collecting Administrative Remedy forms and the Plaintiff turns in the four BP-8 forms he had in his possession and explained to Counselor Samuel that he gave the fifth one to Lieutenant Shomo and Lieutenant Shomo had stuffed it into his security Vest, Counselor Samuel then explained to the Plaintiff that #26 C/o Shomo was not a Lieutenant, but a regular officer and and he should not have been collecting Administrative Remedy forms from Inmates. Counselor Samuel said he was going downstairs to get the fifth BP-8 form from #26 C/o Shomo, and that was the last time the Plaintiff seen Counselor Samuel and the last time the Plaintiff seen that fifth Administrative Remedy Form. #26 C/o Shomo violated the Plaintiff's First Amendment Right to the United States Constitution by concealing and disposing of the Plaintiff's Administrative Remedy grievance form.

**41.** At around between 10:10 a.m. and 10:30 a.m. April 2nd, 2019, a force team in body armor led by #22 Lt. Behle, that included #27 Nayda, #38% K. Maybury, C/o Cundiff and several other officers, came to the Plaintiff's Cell door at EO1-138 and told him to cuff up. The Plaintiff requested a shower and refused to take his Celly back into the Cell until he received a shower. The Plaintiff didn't impose a threat to himself or others, the Plaintiff didn't threaten anybody and the Plaintiff was not damaging government or personal property, The Plaintiff only requested his right to take a shower. On and on for around ten minutes, the force team opened the food Slot and sprayed the Plaintiff with two Cans of O.C. Spray sprayed the Plaintiff with two Cannon burst of Orange Mist Spray and shot the Plaintiff with 40 Mace Paint balls in his chest, stomach, groin, arms, legs and ankle area leaving several permanent Scars. The Plaintiff gave up and was told to remove his pants, before he was cuffed up with his hands behind his back at the food Slot. All of this is caught on Video surveilence and the Plaintiff has good grounds

For a complaint of illegal use of excessive force after they violated his right to take a shower, because of his medical disability with his left foot.

42. As the Plaintiff is being escorted awkwardly backwards from Cell EO1-138 because of his medical problems with his left foot, the Plaintiff could barely breathe, let alone walk. You can see on Video Surveilence, the Plaintiff collapsed to the floor right outside Cell EO1-138 and some of the force team members tried to drag the Plaintiff back into Cell EO1-138 with the threats of assaulting and torturing the Plaintiff. The Plaintiff used his head and feet to stretch out to catch each side of the door frame, so they could not drag him back into the cell to assault and torture him, but the Video Surveilence will show their intent.

43. C/o Cundiff said "I know this inmate, he has medical problems, look at the medical permit on the door" and #22 Lt. Behle said "stand him up and take him down-stairs using procedures."

44. You can view on Video Surveilence, how the force team had problems walking the Plaintiff backwards awkwardly, because of the abnormalities and deformities to the Plaintiff's left foot, which is one of the Plaintiff's chronic care medical problems. The Video will show the awkwardness of the Plaintiff's left foot, the awkwardness of the Plaintiff to walk backwards or up and downstairs and the awkwardness the plaintiff has moving or spraining to his left because of his left ankle.

45. The Plaintiff was brought to the Echo one handicap shower, where they briefly sprayed the Plaintiff in the face and head with water to claim they rinsed the three different chemicals out of the plaintiff's eyes. Then they removed the plaintiff's clothes, put the plaintiff in orange paper clothes and Soft Ambulatory Restraints.

46. #39 RN L. Starr did a restraint check encounter on the Plaintiff in the Health Service Room in Echo one, where the Plaintiff complained of the burning from the three different chemicals, the Force team sprayed or shot him with and complained about the open wounds from the pepper ball gun that had plugs of meat and skin missing from the Plaintiff's right ankle, right leg and right arm, that were never mentioned or treated, that left permanent scars that were bleeding at that time #39 RN L. Starr did not mention them in either of her medical reports at 11:00 a.m. and 11:03 a.m. April 2nd, 2019, she did not mention the wounds or how they occured from the pepper ball gun. # 39 RN L. Starr even twice lied and stated denies any injuries on both her medical reports in the plaintiff's medical file, which means she maliciously denied and hid injuries that were so obvious in a deliberate indifference to conceal and cover up the injuries of the Plaintiff caused by the force team illegal excessive use of force on the Plaintiff.

47. At 3:34 p.m. April 2nd, 2019, RN Kristen Bice, does a restraint check encounter and checks the restraints to make sure they are secure and the Plaintiff has the proper circulation, and explained why she was checking the restraints to make sure there was no swelling from the tightness. The Plaintiff did not complain about the open wounds on his ankles, leg and arm to RN Kristen Bice, because they basically stopped bleeding and started to crust over with scabs.

48. Some time between RN Kristen Bice's medical Restraint check visit at 3:34 p.m. and around 5:35 p.m., you will see on Video Surveilence facing Cell EO1-101 April 2nd 2019, where Plaintiff was still by himself, locked behind a closed door and still in tight Soft Ambulatory Restraints. Several officers were by the officers desk, sitting and standing in a circle on Echo one Unit and Defendant #37 C/o B. Mullins walked over from the group of officers to Cell EO1-101 and stands in front of the cell door window staring at the plaintiff, making threatening remarks. At one point, #37 C/o B. Mullins said "you look to comfortable, we need to come in there and tighten those restraints up". The Plaintiff replied "it don't matter, they are Soft Ambulatory Restraints" and #37 C/o B. Mullins said "would you rather have hard Restraints". The Plaintiff said "it don't matter, this place is Soft" and #37 C/o B. Mullins walked away from the cell saying over his shoulder "Oh, so you think were Soft". A little while after that occured, you can see on Video Surveilence, #37 C/o B. Mullins standing by the entrance door of Echo one Unit, just outside the Unit in the hallway, talking to #38 C/o K. Maybery sitting on the plastic food serving cart, while they both continued to glance over their shoulders towards Cell EO1-101, where the plaintiff was still secured behind the locked cell door, still by himself and still in tight Soft Ambulatory Restraints.

49. Now if you follow the Video footage between Echo one, Echo two, Echo hallway and the Echo Unit Movements office in Echo building on April 2nd, 2019, between 5:30 p.m. and 7:00 p.m., you will see the following paragraph is true and accurate to the Video footage and this was a pre-planned beating and assault of the Plaintiff.

50. On April 2nd, 2019, at about between 6:10 p.m. and 6:40 p.m., Plaintiff was secured behind a locked cell door in Cell EO1-101 and secured in tight Ambulatory Restraints. #23 Lt. D. Murton

#37 % B. Mullins and #38 % K. Maybury came to the Cell door and told the Plaintiff they were doing an Ambulatory Restraint Check. You can see on Video, #38 % K. Maybury is holding the Ambulatory Restraint Key with a long black leather strap in his right hand, dangling down the right side of his leg. #37 % B. Mullins stood in front of the Cell door window and asked the plaintiff to show him the Ambulatory Restraints. The Plaintiff got up from the bed, walked over to the Cell door and showed the defendants the Restraints were still secure on his wrist, around his waist and secured on his ankles #37 % B. Mullins opened the food slot and told the plaintiff to turn around and put his back against the door. So the Plaintiff turned around and put his back against the door, as #37 % B. Mullins reached through the food slot to grab the martin chain from behind the Plaintiff's back and turned his hand from sideways to thumbs up ninety degree's to tighten the chain and pull the plaintiff's secured hands closer to his stomach, still with #37 % B. Mullins holding the Chain from behind the plaintiff's back, #23 Lt. D. Murton, #37 % B. Mullins and #38 % K. Maybury called on the radio to have the Cell door EOI-101 opened, and #37 % B. Mullins walked into the Cell first still holding the Chain from behind the plaintiff's back as #23 Lt. D. Murton and #38 % K. Maybury followed behind #37 % B. Mullins. They walked the Plaintiff to the Center of the Cell and turned the Plaintiff to face the left hand side of the wall with the bunkbed on it, #37 % B. Mullins was standing behind the plaintiff slightly to his left ~~and #38 % K. Maybury was standing in front of the plaintiff~~ slightly to his left and #23 Lt. D. Murton, with his back to the plaintiff, stood closer to the door, but between #37 % B. Mullins and #38 % K. Maybury, looking out the Cell door, #38 % K. Maybury had the Key to the restraints and started fumbling with the restraints on the plaintiff's left wrist as #37 % B. Mullins said "so you think I'm soft," and the plaintiff replied "hell yeah, I think your soft" as the leather strap and restraint popped open on the plaintiff's left wrist, #37 % B. Mullins punched the plaintiff in the left eye and then the Plaintiff was punched twice in the mouth area by #38 % K. Maybury, Causing the plaintiff to stagger back towards the toilet. #37 % B. Mullins and #38 % K. Maybury, Continued beating the plaintiff with their closed fist to the plaintiff's head and face area until the plaintiff fell to the floor and used his feet against the bottom of the toilet, to push his head and face under the bottom bunk, while #23 Lt. D. Murton watched and finally said "Enough! Enough! Stop!", Right before other staff members started arriving. The Video Surveillence will show the plaintiff never defended himself and never threw a punch at these officers and #37 % B. Mullins falsified information on a federal document when he wrote the Incident Report and said the plaintiff hit him in his left eye with his left fist and does not mention the fact the plaintiff was in Ambulatory Restraints. This Situation is a Criminal Case Number 19-cc-50029 and Exhibits 1-A and 1-B, also Administrative Remedy Number 977276-A2, where the Plaintiff exhausted the Administrative Remedy process and the Central office found #23 Lt. D. Murton, #37 % B. Mullins and #38 % K. Maybury were in Violation of Program Statement number - 3420.11 Standard of Employee Conduct, such as those the plaintiff raised in this Remedy Cycle. ~~#~~ See: Exhibits 1-A and 1-B ~~#~~

**51.** The Plaintiff's medical file will show #40 RN M. Bergmann wrote an injury assessment on the Plaintiff April 2nd, 2019, at 6:58 p.m. and 7:38 p.m. In the first one she don't mark pain location or pain quality, but #40 RN M. Bergmann does mention the Plaintiff's injuries happened in EOI Cell 101 and the Cause of the injury was the Inmates Response "they assaulted me". Under Federal Rules of Evidence 803(2), See Michigan V. Bryant 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed. 2d 93 109 (2011) Statements relating to a startling event or condition made' while the declarant was under stress of excitement Caused by the Event or condition, are considered reliable, because the declarant, in the excitement, Presumably Cannot form a falsehood.

**52.** Continuing on with #40 RN M. Bergmann wrote in her assessment " Inmate involved in an immediate use of force in Echo Unit and was escorted via Stretcher to be placed in four point restraints. Inmate placed on bed in Supine position. Inmate Claims to have injuries in multiple area's of his body. Assessment Showed no obvious injuries at this time. In Paragraph 55, you will see #40 RN M. Bergmann's deliberate indifference to the plaintiff with malicious intent by her falsifying information on Federal documents inside the Plaintiff's medical file, to conceal a Criminal Assault and beating of the Plaintiff by the hands of #37 % B. Mullins and #38 % K. Maybury, while #23 ~~#~~ D. Murton Watched.

**53.** The Plaintiff's Medical file will show, #41 RN Vanessa Garcia, did a restraint Check encounter on April 2nd 2019 at 11:04 p.m. and the plaintiff again complained about multiple Injuries that hurt around his body, head and left eye. #41 RN Vanessa Garcia refused to Acknowledge the plaintiff's injuries and complaints, and looking at the plaintiff's medical

File, #41 RN Vanessa Garcia, did not mark down the plaintiff's injuries or complaints in the plaintiff's medical file. In Paragraph **55**, you will see #41 RN Vanessa Garcia not only concealed the plaintiff's injuries from his medical file, you can notice #41 RN Vanessa Garcia's deliberate indifference with Malicious intent to the plaintiff, by falsifying information on federal documents inside the plaintiff's medical file, to conceal a criminal assault and beating of the plaintiff, by the hands of #37 C/o B. Mullins and #38 C/o K. Maybury, while #23 Lt. D. Murton watched.

**54.** The plaintiff's medical file will show #40 RN M. Bergmann, did a restraint check at 13:15 a.m., April 3rd, 2019, and claimed the plaintiff had no complaints, No Pain and No injuries. The plaintiff did complain to her about multiple injuries that hurt around his body, head and left eye and #40 RN M. Bergmann refused to acknowledge the plaintiff's injuries and complaints and looking at the plaintiff's medical file, #40 RN M. Bergmann did not mark the plaintiff's injuries or complaints in his medical file. In Paragraph **55**, you will see #40 RN M. Bergmann not only concealed the plaintiff's injuries from the plaintiff's medical file, you can notice the deliberate indifference with Malicious intent from #40 RN M. Bergmann, against the plaintiff, by falsifying information on federal documents, inside the plaintiff's medical file, to conceal a criminal assault and beating of the plaintiff, by the hands of the defendants #37 C/o B. Mullins and #38 C/o K. Maybury, while #23 Lt. D. Murton watched.

**55.** Video Surveillance of the observation room and the plaintiff's medical file will show RN Kristen Bice, did a restraint check at 6:30 a.m. April 3rd, 2019 and claims the plaintiff had no complaints, no pain and no injuries. But the plaintiff did complain to RN Kristen Bice about multiple injuries that hurt around his body, head and left eye. The Video Surveillance from the hallway looking into the observation cell, will show, at one point, RN, Kristen Bice checked the injuries of the plaintiff's head and left eye and replied "Yeap, looks like you got a black eye and the other marks on your legs and arms are from the pepper ball gun, they crusted over and will heal in good time". RN Kristen Bice taking notice to these obvious injuries, shows the fact that #40 RN M. Bergmann and #41 RN Vanessa Garcia overlooked the plaintiff's medical injuries in their medical assessment Reports and showed the malicious intent with their deliberate indifference to the plaintiff, by concealing his medical injuries by staff members and not reporting them in his medical file. These are considered Deliberate indifferences to medical neglect.

**56.** On April 3rd, 2019, before and after RN Kristen Bice's restraint check and medical evaluation, C/o Burke was sent into the observation room twice to mop up Urine from the plaintiff, who was not allowed to use the bathroom, #24 Lt. Erskine told plaintiff "that's your problem" when the plaintiff requested to use the restroom, when he was secured to the bed. They refused the plaintiff access to use the restroom and at no time will the Video Surveillance show the plaintiff was brought a meal to eat, while he was in restraints, in the observation room. Plaintiff was denied his right to use the bathroom and left without food and water for almost 17 hours. RN Kleopping did give Plaintiff water with his medication, before #24 Lt. Erskine sprayed water around Plaintiff's face with the water bottle and then asked RN Kleopping if he could keep the water bottle because it came in handy for the plaintiff.

**57.** Shortly after C/o Burke mopped up the Urination on the floor the second time in the observation room, #12 Warden Hudson entered the observation room and talked to the plaintiff from the foot of the bed, where the plaintiff was laying secured in four point restraints #12 Warden Hudson explained about knowing the plaintiff from U.S.P. Lewisburg when he was the Warden there and how #12 Warden Hudson watched all the Video Surveillance from several different angles of #23 Lt. D. Murton, #37 C/o B. Mullins & #38 C/o K. Maybury and the plaintiff. Plus now #12 Warden Hudson got each of Defendants #23, #37 and #38 Side of the Story, and now he wanted to hear the plaintiff's side of the story. Then the plaintiff explained to him exactly what happened in Paragraph **50** of this Civil Complaint and how Defendants #23, #37 and #38 assaulted the plaintiff by beating him with their fist, while the plaintiff was in Ambulatory Restraints and without just cause. #12 Warden Hudson said "from what I seen and heard, this incident could go both ways, but I have to side with and protect my officers Right or Wrong, let's work together and put this incident behind us, I'll have you released from restraints and put in your cell like nothing happened, we start over fresh with a clean slate." The plaintiff agreed with the Warden Hudson's terms and #12 Warden Hudson left the observation room with the understanding between him and the plaintiff, that the plaintiff would let the incident go as long as nobody filed paperwork against the plaintiff. That if the plaintiff is attacked with paperwork, the plaintiff will defend himself with paperwork of the truth and #12 Warden Hudson said the plaintiff had that right.

**58.** Not long after #12 Warden Hudson left the observation room, Assistant Warden

Hinkle and Mr. Cottrell entered the observation room and started a conversation with the Plaintiff while he was still in four point restraints. A.W. Hinkle told the Plaintiff "let's just forget this situation ever happened and we all start over with a clean slate, we'll have you removed from restraints, taken back to your Unit and placed back in your cell". The Plaintiff told them "I'm cool with that, even though I never attacked any of them or tried to defend myself and I was assaulted and beaten by these officers. I will put it behind me, not file paperwork and forget it ever happened, but if they file paperwork or incident reports against me, I will defend myself with paperwork as well", and A.W. Hinkle said "I can agree to that" and he and Mr. Cottrell nodded at each other and left the observation room.

59. At around 10:15 a.m. and 12:15 p.m., April 3rd, 2019, the Plaintiff was assaulted several times by #24 Lt. Erskine during two of his two hour restraint checks. During Video Surveilence, of the above mentioned times, #24 Lt. Erskine entered the observation room with several Correctional officers including #28% M. Young and #36% H. Boussaq, with them placing a transparent shield over the Plaintiff's body, face and head, and #24 Lt. Erskine would drop Knee's with his body weight into the Plaintiff's face through the shield, the officers were pressing the Plaintiff's body, head and face to the bunk with, while the Plaintiff was in four-point restraints, secured to the bed. At one point, you can see on Video surveilence, several officers tightening the four point restraints on the Plaintiff's legs, right before #36% H. Boussaq forces fully twisted the Plaintiff's left wrist into a torture tactic and secured it in the handcuff twisted backwards the wrong way, to cause the Plaintiff severe pain and suffering. When these staff members seen the Plaintiff's left hand quickly turn blue and white in color in under a minute and swell up like a balloon, they had trouble removing the Plaintiff's left hand back out of the restraints before they put the Plaintiff's left hand back in the restraint handcuff the right way. % McClain did not participate in any of these assaults and tortures, but he was in the observation room watching from the corner by the sink, as the other officers assaulted and tortured the Plaintiff and % McClain just shook his head slowly from side to side. This was a aggravated assault and torture of a secured inmate in four point restraints, helpless and defenseless. These actions were wanton, malicious and vicious assaults of the Plaintiff and violations of the Eighth Amendment of the United States Constitution pertaining to Cruel and Unusual Punishment of torture with deliberate indifference and retaliation for the Plaintiff complaining about being assaulted. This paragraph pertains to Exhibits 2-A, 2-B, 2-C, 2-D and 2-E, and is also Administrative Remedy Number 977277, A-3 where the Plaintiff exhausted his administrative remedy process, which is in the Central office as of now and should be determined that #24 Lt. Erskine, #28% M. Young, #36% H. Boussaq and other officers violated Program Statement 3420.11 "Standard of Employee Conduct", such as those caused by the Plaintiff in this remedy cycle.

60. On April 3rd, 2019, the Plaintiff was removed from four point restraints and placed in hard Ambulatory restraints by #24 Lt. Erskine, #28% M. Young, #38% K. Maybury and several other officers around between 2:00 p.m. and 2:15 p.m., where the defendants exchanged the restraints, then the Plaintiff was escorted across the compound in the cold, from the Health Services building, to the Echo Unit building, barefoot and in paper clothes, while wearing hard Ambulatory restraints, led by #24 Lt. Erskine and the rest of the officers circled around the Plaintiff. There was still ice and snow in the grass, and about halfway between the buildings, moving across the compound on the sidewalk, Video surveilence, will show the wanton malicious and vicious childish act of criminal assault to the Plaintiff's left foot as #38% K. Maybury kicks the toe of his boot, into the bottom of the Plaintiff's bare left foot, several times as the Plaintiff lifted his feet, to take steps in the hard Ambulatory restraints. NOT only was the Plaintiff barefoot in the cold walking in hard Ambulatory restraints, the Plaintiff has an abnormality and deformity with his left foot that #38% K. Maybury knew about, which includes the amputation of his great left toe, the third and fourth toes on his left foot fold under his foot sometimes when he walks, causing him to have hammer toes and the Plaintiff has Psoriatic Arthropathy of his left ankle that causes him stability and balance problems when he walks. These kicks by #38% K. Maybury were done in a child like manner, from behind, to cause the Plaintiff pain, suffering and harm, to one of his chronic care medical disabilities and placed the Plaintiff's foot in risk of further medical damage in violation of the Americans with disabilities Act of 1974. The deliberate indifference with retaliation, was wanton and a careless act of cruel and unusual punishment to the Plaintiff's disability, with malicious intent to cause the helpless and defenseless Plaintiff in hard Ambulatory restraints, unnecessary pain and suffering. This paragraph is also Administrative Remedy 977280-A2, where the

Plaintiff Exhausted the Administrative Remedy Process and on the date of November 25th, 2019, the Central office found #24 Lt. Erskine, #28 C/o M. Young, #38 C/o K. Maybury and the rest of the group of Officers in Violation of Program Statement 3420.11 Standard of Employee conduct, such as those caused by the Plaintiff in this Remedy cycle. The Plaintiff would have placed these two documents as Exhibits 3-A and 3-B from the Central office, but some how Defendant #4 United States Penitentiary Thomson lost, misplaced or destroyed this paperwork that was suppose to be given to the Plaintiff. The Plaintiff will leave Exhibits 3-A and 3-B open for these documents, maybe they can be copied and recovered by Defendant #7 F.C.O.P. Director Kathleen Hawk.

61. Now after the plaintiff was escorted from the health Services building back to Echo building between 2:00 p.m and 3:15 p.m, April 3rd, 2019, Plaintiff was placed back in Cell EO1-101 in hard Ambulatory Restraints from about 8:15 p.m until around 8:15 p.m. during those hours, you can see on Video Surveilance several times, #23 Lt. D Murton and other officers would do hard Ambulatory Restraint Checks with their night sticks drawn, come into the Cell threatening the Plaintiff with more harsher assaults to try and intimidate the Plaintiff about filing Complaints against them for the beating, assaults and torture tactics these staff members did to the Plaintiff. During the process between staff threats and retaliations by #23 Lt. D. Murton, The plaintiff had another hard Ambulatory Restraint Check by RN Diane Sweeney at 2:40 p.m. April 3rd, 2019 and a hard Ambulatory Restraint Check by #41 RN Vanessa Garcia at 6:30 p.m., April 3rd, 2019, where again these medical Staff members falsely Stated in the plaintiff's medical File that the Plaintiff had no injuries and did not complain about injuries, they all conspired together to cover up these Staff beatings, assaults and torture of this Plaintiff.

62. Some where around 8:15 p.m., April 3rd, 2019, Plaintiff was moved from Cell EO1-101 up to Cell EO1-139 back with Inmate Carmen Grieco 54747-066, where you can see on Video Surveilance #23 Lt. D. Murton with several officers, walked the plaintiff up the stairs barefoot and in paper clothes and still in tight hard Ambulatory Restraints, to the Cell with no blankets or Sheets. Where #23 Lt. D. Murton, told the Plaintiff, he was not getting any sheets or blankets and he was not getting a change of Clothes, Plaintiff was released from hard Ambulatory Restraints inside Cell EO1-139 and locked inside the Cell with Inmate Carmen Grieco 54747-066 for the night.

63. The force team Sprayed so much different types of Chemicals of mace, into the Cell at EO1-138, that the prison, #4 United States Penitentiary Thomson, had to quarantine Cell EO1-138 for nearly four weeks.

64. On April 4th, 2019, at around 8:30 a.m., #19 Counselor Vanodporp brought the Plaintiff an incident Report written by #30 C/o Kaufman for Violation of Code (31a) which was later dismissed because #30 C/o Kaufman falsified information on the Incident Report and the facts of the times, with the Restraint Checks, Video Surveilance, medical reports and log books, did not support the incident Report. #30 C/o Kaufman had written and falsely accused the Plaintiff of wrong doing he could not have done.

65. On April 4th, 2019, at around 8:40 a.m. Video Surveilence will Show #27 C/o Nayda came to the plaintiff's Cell door at EO1-139 and escorted the Plaintiff to the Second floor Shower stall cage, while the plaintiff was still barefoot and in paper clothes to continue the deliberate indifference and retaliation against the Plaintiff and more Cruel and unusual punishment to the Plaintiff's disability of his left foot and ankle.

66. On April 4th, 2019, at around 9:05 a.m., #22 Lt. Behle brought the Plaintiff a Second Incident Report to the Shower Stall writen by #25 C/o D. Heim for Violations of Codes (305), (307), (399) and (404) which were later UDC'd by Case manager Marshal and to the Plaintiff's understanding dismissed because the evidence, witnesses and the Video Surveilence did not support #25 C/o D. Heims Claims in his Incident Report and would in fact show the Plaintiff was denied a shower because of his medical disability and show the facts that not only illegal use of Excessive Force was used, also #25 C/o D. Heim falsified information on a Federal Document by saying the plaintiff threatened him in the incident Report, Plaintiff never threatened this officers.

67. On April 4th, 2019, at around 9:10 a.m. #27 C/o Nayda escorted the plaintiff back from The Shower area and you can see on Video Surveilence the plaintiff was still in paper clothes and barefoot heading from the Shower back to Cell EO1-139, to prove the Continued deliberate indifference to the Plaintiff's medical disability as retaliation against the Plaintiff.

68. On April 4th, 2019, at around 9:30 a.m., C/o Stykes brought the Plaintiff a third incident Report written by #37 C/o B. Mullins for Violation of Code (224 Minor Assault) that was Signed in red ink by "Vanodrop" where Somebody else not only Signed #19 Counselor Vanodporp's

Name, but also mis-spelled his name during the signature of it.

**69.** On April 8th, 2019, the Plaintiff turned in three BP 8 forms to #17 Unit Manager Moesh for the three assaults, beating and torture in Paragraphs 50, 59 and 60 in this Civil Complaint that occurred to the plaintiff. These are Administrative Remedies 977276-A2, 977277-A3 and 977280-A2 that the Plaintiff completely Exhausted the Administrative Remedy Process on. ~~See Exhibits 1-A, 1-B, 2-A, 2-B, 2-C, 2-D, 2-E, 3-A and 3-B~~

**70.** On Thursday, April 11th, 2019, #17 Unit Manager Moesh Came to the Plaintiff's Cell at EOL-137 between 2:00 p.m. and 2:30 p.m. You can see on Video Surveilence in front of the Cell, #17 Unit Manager Moesh tore up the Plaintiff's three BP 8 forms the Plaintiff had written in Violation of the Plaintiff's First Amendment Right to Redress his grievances and then #17 Unit Manager Moesh mis-led the plaintiff by going back to his cart/retrieving three BP 9 forms and brought them back to the Plaintiff and told him to file the three BP 9 forms as Sensitive BP 9 forms directly to the warden, purposely delaying the Plaintiff's Administrative Remedy Process.

**71.** On Friday, April 12th, 2019, Plaintiff tried to give Sensitive BP-9 forms to #12 Warden Hudson, like #17 Unit manager Moesh told the Plaintiff to do. #12 Warden Hudson told Plaintiff "I don't accept BP-9 forms, you need to give those to one of your unit team members". As #12 Warden Hudson walked off, Plaintiff seen Case Manager Boyer coming down the range, so the plaintiff turned in the three Sensitive BP 9 forms Completely and properly filled out to Case Manager Boyer.

**72.** On Monday, April 15th, 2019, #20 Case Manager Wood brought back the three BP 9 forms the plaintiff turned in Friday April 12th, 2019, to Case Manager Boyer and handed the plaintiff three BP-10 Administrative Remedy forms and told the Plaintiff "We don't do Sensitive one's at this prison, file them as Sensitive ten's to the Regional Director's office". Right then the plaintiff Knew to be persistant with the Administrative Remedy Process filings, because #12 Warden Hudson, #17 Unit Manager Moesh and #20 Case Manager Wood were working together to Cause the plaintiff delay's in the Administrative Remedy Process, in Violation of his First Amendment Right to the United States Constitution and to Conceal the Criminal Acts of the beating, assaults and tortures, along with Illegal use of excessive force against the Plaintiff by defendants #22 Lt. Kehle, #23 Lt. D. Murdoct, #24 Lt. Erskine, #27 C/o Nivida, #28 C/o M. Young, #36 C/o H. Boussay, #37 C/o B. Mullins and #38 C/o K. Marbury.

**73.** On April 11th, 2019, about between the times of 1:30 p.m. and 2:30 p.m., C/o Troutman came to the Plaintiff's Cell door at EOL-137 and brought the Plaintiff down to a Conference room with #10 F.B.I. Agent C. Avender and #14 S.I.S. Cruze, to be interviewed. The Plaintiff about the incident that occurred in Paragraph 50 of this Civil Complaint. While C/o Troutman stood to the right with his baseball cap pulled over his eyes as he bounced himself lightly against the wall, #14 S.I.S. Cruze sat at the ~~corner of the table to the plaintiff's~~ Corner of the table to the plaintiff's left and #10 F.B.I. Agent C. Avender sat at the table at the back of the room, Straight ahead of the Plaintiff standing in the locked Security Cage. The plaintiff explained to Defendant's #10 and #14 detail by detail of what happened in paragraph 50 of this Civil Complaint and mentioned what happened in Paragraph 59 and 60 of this Civil Complaint. The plaintiff Knew they were recording him and probably had him under Video Surveilence as well. The Verbal statement was almost an hour long and after the Plaintiff Completed his Verbal statement to Defendants #10 and #14, The Plaintiff gave Defendants #10 and #14 permission to copy his three BP-10 Administrative Remedy forms he was trying to send out, that the plaintiff wrote that were about Paragraphs 50, 59 and 60 of this Civil Complaint and ended up being Exhausted Administrative Remedies 977276-A2, 977277-A3 and 977280-A2 respectfully. At one point, during the interview, #14 S.I.S. Cruze shook up to his feet and stated in front of C/o Troutman and #10 F.B.I. Agent C. Avender "staff assaults and staff misconducts are internal issues, that will be addressed internally". This shows the facts of how #10 F.B.I. Agent C. Avender, #13 S.I.A. Hansen and #14 S.I.S. Cruze Knew they were using false information and false statements on Federal Documents to Create a Specious Crime against the Plaintiff, using perjured testimony by correctional officers to cover up the beating and assaults Defendants #23, #24, #33, #36, #37 and #38 did to the Plaintiff. In Violation of the Plaintiff's Fourth, Fifth, Sixth and Fourteenth Amendment Rights to the United States Constitution.

**74.** On April 19th, 2019, Plaintiff turned in three Separately sealed legal letters to Case Manager Boyer, each one to be sent out as legal mail to the North Central Regional office Containing Administrative Remedies 977276-A2, 977277-A3 and 977280-A2.

**75.** On May 2nd, 2019, the North Central Regional office Director #9 J.E. Krueger Sent the Plaintiff a letter for each of his three Sensitive Administrative Remedy Forms Stating staff assaults on inmates are not Sensitive for the plaintiff to Start the Administrative Remedy process over at the institutional level. Which shows the fact #9 Director J.E. Krueger, #12 Warden Hudson, #17 Unit Manager Moesh and #20 Case Manager Wood are the one's responsible for the delay's

in the Administrative Remedy Process to Violate the Plaintiff's First Amendment Right in the United States Constitution.

76. On June 6th, 2019, at around between 5:05 p.m. and 5:25 p.m., #38% K. Maybury and several other officers led by #24 Lt. Erskine, came to the Plaintiff's cell door at FOI-140 to allegedly do a routine cell search. Upon cuffing the Plaintiff up and roughly pulling him out of the cell in a aggressive manner, #38% K. Maybury pulled at the Plaintiff's left ear while yanking the Plaintiff's hearing aid out of his left ear, causing a form of pain and discomfort to the Plaintiff's disability in violation of the Americans with Disabilities Act of 1974. This was a wanton Criminal Assault blantantly done with deliberate indifference and retaliation for the Plaintiff filing Administrative Remedies 977276-A2, 977277-A3 and 977280-A2 and this assault was unjustifiable. Also, this Criminal Assault was done to the Plaintiff while he was helpless and defenseless with his hands cuffed behind his back. Video Surveillence on Frank One Unit, in front of Cell FOI-140 will show #38% K. Maybury pulled the Plaintiff's left ear when he yanked out the Plaintiff's hearing aid. This was a Criminal Assault to one of the Plaintiff's medical disabilities in violation of the American Disability Act of 1974, and in violation of the Eighth Amendment Right of the United States Constitution for Cruel and Unusual Punishment. This Paragraph is also Administrative Remedy 982571-A1 where the Plaintiff Exhausted his Administrative Remedy Process and the Central Office found D Sendant #38% K. Maybury Violated program Statement 3420.11 Standard of Employee Conduct, Such as those raised by the Plaintiff in this Remedy Cycle. See: Exhibits D1 and D2.

77. On June 6th, 2019, between 5:00 p.m. and 6:00 p.m., #38% K. Maybury and other officers led by #24 Lt. Erskine came to the Plaintiff's cell at FOI-140 and removed Plaintiff and his celly Mr. Gricco from their cell and took them to the shower area and locked them in the shower cage, so the staff members could allegedly do a routine shakedown of the Plaintiff's cell. After the search of the cell and staff members finding no contraband, Plaintiff and his celly Mr. Gricco were returned to Cell FOI-140. Plaintiff found his new hearing aid #38% K. Maybury yanked out of his ear, submerged in Cool-Aid in the hearing and case and the Plaintiff's old hearing aid was wet inside the old hearing aid box. Two rolls of toilet paper were soaked in Cool-Aid and disinfectant, with one in the middle of the cell floor in a puddle and the other inside the toilet bowl in the cell. Lotion and foot powder were poured and sprayed on the Plaintiff's legal material, personal property and personal paperwork. Plaintiff's food and coffee he purchased from Commissary had holes poked in the packages and the packages were ripped open with the contents then spread around the Plaintiff's cell, in his personal property bag and over the top of both his legal and personal paperwork. The Plaintiff's candy bars were took out of the wrappers and dropped in the toilet with the empty wrappers laying beside the toilet. The Cell FOI-140 was left torn apart with cards, medications and other personal property tossed around the cell and Mr. Gricco's MP-3 Player was stepped on and dropped in the toilet with the toilet paper roll and candy bars. Plus several pair of Earbuds were torn apart, one of each of ours from our personal property and one of each of ours from their MP-3 players assigned to us by #4 United States Peníentiary Thomson. These acts of destruction of the Plaintiff's personal property, legal material and medical devices were done maliciously with deliberate indifference and retaliation for the Plaintiff filing Administrative Remedies numbers 977276-A2, 977277-A3 and 977280-A2. This was a retaliation for the Plaintiff exercising his Constitutional Rights and Constitutional Rights of Prisoners. This Paragraph is also Administrative Remedy 982559-A1, where the Plaintiff exhausted his Administrative Remedy Process and the Central Office found #24 Lt. Erskine, #38% K. Maybury and other staff members were in Violation of program Statement 3420.11 Standard of Employee Conduct, such as those raised by the Plaintiff in this Remedy Cycle. See: Exhibits E1 and E2.

78. On June 6th, 2019, shortly after the Plaintiff was returned to his cell at FOI-140 and started cleaning the destruction the officers left behind, between 5:30 p.m. and 6:15 p.m. Defendant #38% K. Maybury came back to the Plaintiff's cell animated as you will see on Video Surveillence and as he stood outside Cell FOI-140 with the food slot open, #38 % K. Maybury said to the Plaintiff "Your gonna give me your clothes, I found a ripped sheet in your cell and if you don't give me your clothes, I'll come in there and rip them off of you. I want to look at your little dick, see the brown of your asshole, look, I want to suck your dick and fuck you in the ass while I give you a reach around." NOT only did the Plaintiff give #38% K. Maybury his clothes through the food slot and

#38 C/o K. Maybury gave the plaintiff medium paper clothes that would not fit the plaintiff's 5'10 and 225 pound frame, as #38 C/o K. Maybury said " you got a little dick, if you let me suck your dick, maybe when I fuck you in the ass, I will give you a reach around." Not only, did the plaintiff not have a ripped sheet in his cell on June 6th, 2019. Inmate Smith across the range in FOI-132 Cell was yelling he seen #38 C/o K. Maybury cut a sheet in half while #38 C/o K. Maybury was in Cell FOI-140. #38 C/o K. Maybury sounded like a sexual predator about to commit a sexual assault with his remarks, comments and actions. Very unprofessional and this was said in retaliation against the plaintiff for complaining about the assaults that occurred to the plaintiff in April 2nd and April 3rd 2019, in Administrative Remedies 977276-A2, 977277-A3 and 977280-A2.

Then the following day, June 7th, 2019, around 8:40 p.m., #38 C/o K. Maybury walked up to the plaintiff's cell door at FOI-140 and said "you little snitch ass mother fucker with your little dick, you told on me", while he stopped briefly at the cell door window to speak to the plaintiff. Officer Lopez and another officer were about ten steps behind not following K. Maybury around the range as the plaintiff said to #38 C/o K. Maybury " will you repeat that so I can write it down." C/o Lopez and the other officer started laughing as #38 C/o K. Maybury something else over his shoulder as he kept walking around the range, #38 C/o K. Maybury did not say I was joking or you lied on me, he just mentions the plaintiff told his Psychology Specialist about the sexual remarks he made to the plaintiff, and the Psychology Specialist told their supervisor who filed a PREA Complaint against #38 C/o K. Maybury. #38 C/o K. Maybury basically said the plaintiff " snitched" on him for what he said to the plaintiff, facts.

Then on June 10th, 2019, Video surveillance will again show #38 C/o K. Maybury come to the plaintiff's cell at FOI-141 between 7:50 p.m. and 8:00 p.m., and said, " hey tatter tot's, what's up? you didn't get my words exactly right in your complaint" and he walked around the tier to Cell FOI-132 for allegedly another routine Cell Search. After escorting two inmates to the shower area and securing them in the shower Cage. Video Surveillance will show #38 C/o K. Maybury came back to Cell FOI-132 across from the plaintiff's cell in FOI-141, while C/o Shellhammer Searched Cell FOI-132. #38 C/o K. Maybury stood in the door way yelling across the range to the plaintiff " tatter tot!, I'm gonna come over there and play with your little dick. I'm gonna get you a 205 seties shot or have someone write you up for a 205 incident report. These acts are very unprofessional with Sexual misconduct remarks and sexual behavior towards the plaintiff. These last two paragraphs in paragraph 78 of this Civil Complaint are Administrative Remedy number 981198-A1 where the plaintiff Exhausted his Administrative Remedy Process and the Central office found #38 C/o K. Maybury Violated Program Statement 5324.11 Sexual abusive behavior and Prevention and intervention program, the plaintiff's specific allegations of sexual abuse by a staff member was referred to the appropriate authority for further review. A thorough review will be conducted and the proper action taken as deemed necessary. (See: Exhibits F-1 and F-3, the Central office never gave the plaintiff back Exhibit F-2, the second page to his Administrative Remedy 981198-A1 but it can be received by defendant #7 F.B.O.P. Director Kathleen Hawk from the plaintiff's file or #38 C/o K. Maybury's file #8.)

79. On June 7th, 2019, at around 10:30 a.m., Plaintiff told Psychology team members Mr. Theissen, Mr. Walter and Ms. Kenan about the sexual harassment and remarks of #38 C/o K. Maybury, made to the Plaintiff in Paragraph 78 of this Civil Complaint. The Psychology team members went to one of their supervisors in Ms. Mccrea, who filed a PREA complaint on the behalf of the plaintiff, to the prison #4 United States Penitentiary Thomson. Then the plaintiff was interview by RN Bungard and Ms. Mccrea, with two other staff members in the medical room, while RN Bungard did the PREA Evaluation encounter on the plaintiff, June 7th, 2019, at 13:06 (✱ See: Plaintiff's medical file ✱). Ms. Mccrea told the plaintiff" they will address the problem and this type of unprofessional misconduct will not happen again. but as you can see in paragraph 78, it started again 150 minutes after the first PREA Complaint.

80. On June 11th, 2019, because of the harassment and more sexual misconduct Remarks made to the plaintiff, by #38 C/o K. Maybury. Plaintiff reported sexual misconduct Remarks to Case manager Barfield, who filed a second PREA Complaint on the behalf of the plaintiff. RN Kristen Bice did a second PREA Evaluation encounter on the plaintiff June 11th 2019, at 10:07 a.m., and Plaintiff gave RN Kristen Bice a 15 page document to give to S.I.S. Cruze and for S.I.S. Cruze to give it to S.I.S. Hansen and F.B.I. Agent C. Awender. Then Psychology head or Personnel Ms. K (she has a long difficult last name to pronounce, let alone spell), Cluke to see the plaintiff and talked to him about the prior incidents and present incident and said she was reporting these incidents to S.I.S. Cruze and S.I.A Hansen. #13 S.I.A. Hansen interviewed the plaintiff and said the 15 page document he received has nothing to do

with the present issue with #38% K. Maybury, #13 S.I.A. Hansen only wanted to know about June 6th, 7th and 10th of 2019, pertaining to #38% K. Maybury's unprofessional sexual misconduct towards the Plaintiff. After the brief interview, of the Plaintiff explaining what occurred in Paragraph 78 of this Civil Complaint, #13 S.I.A. Hansen told the Plaintiff "you have been indicted for assaulting an officer, your being prosecuted." #13 S.I.A. Hansen ignored the facts of the conduct of #38% K. Maybury to help cover up these assaults, beating and tortures of the Plaintiff and helped #33 H.O. Murton, #37% B. Mullins and #38% K. Maybury use false information with #10 F.B.I. Agent C. Aweader and #14 S.I.S. Cruze to wrongfully prosecute the Plaintiff with Malicious Intent.

**81.** On June 24th, 2019, officers came to the Plaintiff's cell and told the Plaintiff to pack up his personal property, that the Plaintiff was leaving on a Court writ. The Plaintiff packed up his personal property and was escorted with his personal property across the compound to R&D, where the Plaintiff turned over his personal property to R&D supervisor Mrs. Cruze (the wife of S.I.S. Cruze) The Plaintiff was allowed to keep his medical equipment of medical shoes, medical ankle brace, abdominal binder and hearing aid in his left ear, then the Plaintiff was escorted to the transport bus to go to Court. After arriving in the Chicago Rockford International airport, two United States Marshal's picked the Plaintiff up from the transit bus and moved the Plaintiff to their transport vehicle. The Plaintiff complained to the Marshal's about the tightness of the hard Ambulatory Restraints and showed the Marshal's the circulation in his left hand was not working, which was swollen and ash purple while being numb. Plus the Plaintiff had numbness in his right hand thumb, in which both Marshal's complained Correctional officer's put the restraints on extremely tight, they would log a complaint against #3 The Federal Bureau of Prisons with the Court, but they couldn't remove the restraints until they reached the Court building. Finally, when the two Marshal's placed the Plaintiff in the holding Cell and removed the restraints, they seen the Plaintiff was telling the truth and seen the Plaintiff had almost centimeters deep trenches in his skin, completely around the Plaintiff's wrist.

**82.** After sitting in the holding cell for a little while, with the Plaintiff trying to work the circulation back into his hands, the Marshal's came back to the holding cell and took the Plaintiff to see the Federal Public Defender the Court assigned to represent him in Court on this 24th day of June, 2019. The Plaintiff was then able to speak with Attorney Jill M. Skwor of the Federal Defender Program and the Plaintiff explained to this Attorney, he was not guilty of the charged indictment, that the Defendants #33, #37 and #38 created a specious crime against the Plaintiff and used it to cover up the beating and assaults on the Plaintiff, and now the Plaintiff needed Attorney Jill M. Skwor's help defending himself in trial, because he was beaten and assaulted multiple times, by multiple officers, over several days of being tortured in three different forms of restraint's (See: Paragraphs 50, 59 and 60 of this Civil Complaint).

**83.** Shortly after our Attorney-Client agreement, the Plaintiff was brought into the Courtroom and Attorney Jill M. Skwor introduced Plaintiff to Investigator Brad Stallings. After a few minutes, Magistrate Judge Johnston entered the Courtroom and explained the charged indictment to the Plaintiff under Title 18 U.S.C. § 111 (a) and (B) that the grand jury indicted him for. The Plaintiff listened to the judge while he read the prosecutors proposed agreement pertaining to the media being black balled, that he wanted my Attorney Jill M. Skwor to sign. After the Plaintiff read it in open Court, he told the Court and Attorney, he would be contacting the media and has already sent letters out to the media. The Plaintiff explained to Attorney Jill M. Skwor, she could sign it if she wants to, but the the Plaintiff wouldn't sign it. Then Judge Johnston talked about Attorney Jill M. Skwor and Investigator Brad Stallings coming to visit the Plaintiff at #4 United States Penitentiary Thomson. After Court, the Plaintiff spoke briefly with Jill M. Skwor and Brad Stallings and then the Marshal's took the Plaintiff to be processed for the charged indictment before they drove the Plaintiff back to the Chicago - Rockford International airport, to be placed back on the transport bus going back to #4 United States Penitentiary Thomson.

**84.** Upon the Plaintiff's arrival back at #4 United States Penitentiary Thomson, the Plaintiff was walking off the transport bus and #38% K. Maybury grabbed the Plaintiff by his left arm and said to the other officers standing around the Plaintiff "look!, he's trying to escape" and another officer said "I'm not a part of this come on" and he took the Plaintiff by his right arm and lightly tugged him away from #38% K. Maybury and escorted the Plaintiff into the R&D area to be process back into the prison.

85. On June 26th, 2019, C/o Jastal came to the Plaintiff's Cell at FO1-142 and told the Plaintiff, he had to go down to medical, to do a blood draw for the medication the Plaintiff takes, that the Plaintiff get's blood draws once a month for his chronic care medical problems. After RN Daag drew a couple of tubes of blood from the Plaintiff C/o Jastal was starting to escort the Plaintiff back to his Cell, when #38 C/o K. Maybury stepped into the room and tried to grab the Plaintiff while saying to C/o Jastal, "I got him" and C/o Jastal said "No, I'm his escorting officer." #38 C/o K. Maybury left out of the medical room first and held the see and door open for the Plaintiff and C/o Jastal, while #38 C/o K. Maybury said to the Plaintiff "ladies first faggot" and the Plaintiff said "faggot, faggot is you saying you want to suck my dick and fuck me in the ass while you give me a reach around", #38 C/o K. Maybury said "fuck you" and the Plaintiff said "it was you who talked about coming over to play with my dick, that's being a faggot". C/o Jastal said "that's enough" and the Plaintiff said to C/o Jastal, "I apologize for my remarks, I was just responding to what he said to me.

86. On July 11th, 2019, The Plaintiff, In Criminal Case Number 19-cr-50029, caused to be filed, four prose motions to the Seventh Circuit District Court declaring to Paragraph 50 of this Civil complain. One, a motion to remove any and all enhancement penalties under title 18 U.S.C. § 111(a) and (b), that none of these alleged injuries rise to legally significant injuries. Two, motion to file counter assault complaint against #23 Lt. D. Murdor, #51 C/o B. Mullins and #38 C/o K. Maybury, who assaulted the plaintiff multiple time, with other officers on multiple ocassions, separate from one another. Three, motion for a polygraph test for #23 Lt. D. Murdor, #57 C/o B. Mullins #38 C/o K. Maybury and the Plaintiff himself. Four, motion for a court order to allow plaintiff access to the courts. Motions one and two are evidence in this Civil complaint and Motion three, if granted, will become factual evidence in this Civil complaint. *Attention* This is a Civil complaint, In a criminal case such as 19-cr-50029 individual's assertion of his or her fifth Amendment privilege to remain silent can not be used against them, and a jury is not permitted to draw a negative inference from their refusal to answer a question. But that rule doesn't apply in Civil Action. Here, if the Correctional officers or staff members refuse on Fifth Amendment grounds to say whether they were involved in an assault, beating or torture conspiracy of the plaintiff, their refusal to answer the question could be used against them and his or her alleged co-conspirators, and the jury would be permitted to draw any negative inference if saw fit.

87. On October 4th, 2019, this is the first of three issues being brought up that the Plaintiff filed as RP-8's with counselor Broton on October 10th 2019, and became Administrative Remedy 994339-A1 and part of Administrative Remedy 999981-A1 in in the Central office, with this first one being based on the assault by #38 C/o K. Maybury and the attempted spectrous criminal Act by #38 C/o K. Maybury and #38 C/o H. Boussaq, where Video surveilence will show between 7:10 a.m. and 7:30 a.m. October 4th 2019. Beginning on the upper tier of Echo one Unit in front of Cell EO1-135 and ended with #38 C/o K. Maybury slamming the Plaintiff face first into the concrete in deliberate indifference with Retaliation for the Plaintiff filing 977276-A2, 977277-A3 and 977280-A2, 982571-A1 982559-A1 and 981198-A1 complaints against him and other staff members. You can see on Video surveilence, #38 C/o K. Maybury across the hall at Cell EO1-13B talking trash to the plaintiff behind his cell door at EO1-135 during recreation Call. while officers were pulling inmates out of their cells to escort them to the recreational Cages. #38 C/o K. Maybury rushes downstairs and brings back up the recreation list and goes over to #38 C/o H. Boussaq and yells out loud Very aggressively "I'm getting Cell 135" and pokes at the recreation list several times before #36 C/o H. Boussaq walks with #38 C/o K. Maybury straight to the Plaintiff's Cell at EO1-135. #38 C/o K. Maybury said "you both going to Rec", and the Plaintiff said "No, just one", before turning around to have his Uhands cuffed behind his back through the open food slot. #38 C/o K. Maybury just layed the open handcuffs unsecured over the Plaintiffs wrist and told the Plaintiff "step away from the door" as #36 C/o H. Boussaq and #38 C/o K. Maybury stepped back from the Cell door waiting for the handcuffs to fall to the floor if the plaintiff moved, so they could have reason to assault him. The Plaintiff said "not until you secure the Cuffs" #38 C/o K. Maybury said "step away from the door now", and the Plaintiff said "Not until you secure the Cuffs", #38 C/o K. Maybury said "I'm giving you a direct order to step away from the door" and a third time the Plaintiff said "Not until you secure the Cuffs", #38 C/o K. Maybury said "Okay, have it your way" and you can see on Video surveilence, #38 C/o K. Maybury steps back towards Cell door EO1-135 empty handed and wraps both his hands around the unsecured handcuffs on both the Plaintiff's wrist and secures the handcuffs while squeezing them as

Tight as he could, tearing open skin and causing instant bleeding to the plaintiff's wrist as #38 C/o K. Maybury said "I'm gonna chomp your fathers off," or something like that. The Plaintiff stepped away from the door and his Celly Mr. Gricco cuffed up, then the officers called on the Radio to control to open Cell door EOL-135. #38 C/o K. Maybury grabbed the Plaintiff as he stepped out of the cell and #38 C/o K. Maybury said to the Plaintiff "I can't wait to get you, your mine." You can see on Video Surveillence he does a lousy Pat down search of the plaintiff, before escorting him across the Unit, down the stairs, passed the shower area and through two doors to get to the recreation cages. As #38 C/o K. Maybury and the Plaintiff were walking passed other officers, the plaintiff would say "good morning" to them, and when the Plaintiff said "good morning" to #39 C/o Gamble she said "good morning" in return and #38 C/o K. Maybury tripped the Plaintiff by striking his medically problemed ankle area as he guided the Plaintiff's face first into the concrete, as the plaintiff tried to plant his other foot to absorb some of the impact of the assault. Then several officers piled onto the plaintiff, who suffered injuries of a golfball size lump to the outer left eye socket with a blackeye stretching from his nose to his left temple, also the plaintiff's upper left cheek bone was damaged under his left eye and a tooth in the upper back left side of his mouth was cracked or shattered, where the plaintiff could feel the hole with his tongue where the filling use to be. As the officers stood the plaintiff on his feet, #38 C/o K. Maybury started saying to Lt. Murillo and other officers" he said something inappropriate to officer Gamble and turned aggressively towards her, so I took him down to the ground". All the Plaintiff told #39 C/o Gamble was "good morning" and she said "good morning" right back before #38 C/o K. Maybury assaulted the Plaintiff with wanton intentional willful, malicious and reckless deliberate indifference in retaliation against the plaintiff in connection with Criminal Case Number 19-cr-50029 and in retaliation for the plaintiff exercising his Constitutional Rights by filing Administrative Remedies 977216-A2, 977280-A2, 982571-A1 982589-A1 and 981195-A1 against C/o K. Maybury, where the Central Office found #38 C/o K. Maybury violated Program Statement Code 3420.11 Standard of Employee Conduct four times and Violation of Program Statement 5324.11 sexual Abusive Behavior Prevention and intervention once.

88. On October 4th, 2019, this is the second of three issues being brought up that the Plaintiff filed BP-8's forms on October 10th, 2019 to counselor Becton and became Administrative Remedy Number 994381-A1 and part of Administrative Remedy number 999981-A1 in the Central Offices with this second one being based on several more malicious assaults by #37 C/o B. Mullins with the assistance of #25 C/o D. Heim and #35 C/o A. Lashelle, after being assaulted by #38 C/o K. Maybury with the assistance of #36 C/o H. Boussag and #29 C/o Gamble October 4th, 2019. Right after the incident in Paragraph 81 of this Complaint, the Plaintiff was walked from the Recreation yard, through Echo one Unit to the Echo one hallway where the Plaintiff was assaulted multiple times by #37 C/o B. Mullins with #25 C/o D. Heim and #35 C/o A. Lashelle holding him, while they were removing the plaintiff's medical equipment and clothes, to put the Plaintiff in Paper clothes and hard Ambulatory restraints for complaining about being assaulted by #38 C/o K. Maybury. The plaintiff complied with #25 C/o D. Heim #33 C/o A. Lashelle and #37 C/o B. Mullins removing the plaintiff's medical shoes, medical Ankle brace and clothes and Complied with them putting the plaintiff in Paper clothes and hard Ambulatory Restraints. But during the process, plaintiff was punched in the right side of his rib cage, Charlie horse punched in the groin area causing the swelling in the Plaintiff's hernia to stretch all the way down to his Right testicol and while they pulled the martin Chain around the plaintiff's body, everybody heard a Crack and pop in the Plaintiff's back and the Plaintiff felt a pop and pinch in his lower back spine area, that caused a shooting pain in his nerves through his lower back and body, in his upper buttocks area and down the back of his thighs, still causing the plaintiff pain and nerve damage four months later as he writes this "Civil Complaint. #37 C/o B. Mullins also punched the plaintiff in his middle spin area and while #37 C/o B. Mullins was connecting the handcuffs through martin Chain with #25 C/o D. Heim and #35 C/o A. Lashelle holding the plaintiff's head down with #25 C/o D. Heim stating twice "Keep your head down" and twice #37 C/o B. Mullins swung his hands upwards twice, from the cuffs, to strike the plaintiff twice in the face twice, which means all three officers were working together in this deliberate indifferent wanton Malicious assault and retaliation against the Plaintiff, trying to assault and torture the Plaintiff and cause him unjustified pain and harm still lasting through this time. These assaults and beating type acts were done to cause pain, suffering and harm to the plaintiff for retaliation with malicious intent involving deliberate indifference from #37 C/o B. Mullins and #25 C/o D. Heim's wanton intentional Cruel and Unusual Punishments. At

on point, Plaintiff stated "I'm gonna file assault charge's against you's" and #37 C/O B. Mullins replied "Your one of a million assault complaints against us, we work for the Federal government, we get away wit it.

when the plaintiff spoke to #35 C/O A. Laselle the following morning October 5th, 2019 while he was passing out breakfast trays, the plaintiff said "Sir, with all due respect, I'm gonna have to write you up for that assault that occured to me yesterday." #33 C/O A. Lashelle said "I didn't do nothing wrong, all I did was hold you, I didn't hit you in the face, go ahead and write it up, do what you gotta do." This was a blantant beating, assault and retaliation by #37 C/O B. Mullins and #25 C/O D. Heim in connection with criminal case number 19-cr-50029 and for the plaintiff exercising his constitutional Rights filing 972276-A3, 977277-A3, 977280-A2, 982571-A1, 982559-A1 and 981198-A1 where the plaintiff exhausted his Administrative Remedy Process through the central office.

89. Starting October 4th, 2019 and continuing through October 5th, 2019 this is the third of three complaints the plaintiff filed as BP 8 forms with Counselor Broton October 10th, 2019. with this third one being based around deliberate indifference with medical neglect and discrimination in a malicious and vicious manner, from medical injuries caused by staff assaults on the plaintiff. After the plaintiff was assaulted by #38 C/O K. Maybury with the assistance of #36 C/O H. Boussaq and #39 C/O Gamble, and then being assaulted by #37 C/O B. Mullins with the assistance of #25 C/O D. Heim and #33 C/O A. Lashelle. Plaintiff was placed in cell #EOI-123 in hard Ambulatory Restraints where he talked to Dental Assistant Ms Aldrich and Education Department Teacher Ms. Hubbard where the plaintiff showed these staff members his injuries which consisted of a blackeye with a lump on it, a broken tooth with a torn gum and tight hard Ambulatory restraints which were digging into the plaintiff's wrist and body which were bleeding and left permanent scars. #27 C/O Nayda, #39 C/O Gamble, #41 RN Vanessa Garcia, Lt. Murillo and several other officers entered cell EOI-123 and checked the plaintiff's restraints while first #41 RN Vanessa Garcia took one photo of the plaintiff's injury's to his left eye and face, and then Lt. Murillo took a second photo of the plaintiff's injury's to his left eye and face. Then #27 C/O Nayda tried to reason with the plaintiff not to file anymore Administrative Remedies against #25 C/O D. Heim, #39 C/O Gamble, #33 C/O A. Lashelle, #36 C/O H. Boussaq, #37 C/O B. Mullins and #38 C/O K. Maybury. Lt. Murillo listened while #27 C/O Nayda said he would have the plaintiff removed from hard Ambulatory restraints and placed back in his cell EOI-135. After being released from hard Ambulatory Restraints, just before 4:00 p.m., October 4th, 2019, the plaintiff felt severe pain from his left eye to his left temple and down the side of his face. The plaintiff felt pain in the back upper part of his mouth, the plaintiff felt pain in his middle and lower back with nerve pain shooting down through his tail bone, upper buttocks area and the back of his thighs. The plaintiff felt pain in his groin area where the swelling was three inches around, going from his right testical up the right side of his groin area almost one inches, half way to his stomach. The plaintiff also had swelling, welts and slicing cuts around both his wrist, his sides and behind his back from the handcuffs and hard Ambulatory restraints that were bleeding and would up being permanent scars on his body that needed to be addressed by medical staff members, when Lt. Murillo and #27 C/O Nayda came in at 2:00 p.m, they told the plaintiff he could speak to medical about his injuries, medical will come to the plaintiff when he is removed from hard Ambulatory Restraints. #24 Lt. Erstine and #27 C/O Nayda seen the plaintiff just before 4:00 p.m, when with a group of officers surrounding the plaintiff, they escorted the plaintiff back up to his cell in hard Ambulatory Restraints from cell EOI-135 back to his cell at EOI-135 and removed the plaintiff from the restraints just inside his cell. Both #24 Lt. Erstine and #27 C/O Nayda told the plaintiff again, that medical will be around to look at his injuries as they locked the plaintiff in his cell, with the group of officers now around the two of them. Then at 5:50 p.m, Friday, October 4th, 2019, RN Bungard came around doing her medical rounds with #38 C/O K. Maybury and the plaintiff showed and told RN Bungard he had a medical emergency and tried to pass RN Bungard a medical cop-out through the door, that #38 C/O K. Maybury tried to snatch out of the door. The plaintiff pulled the cop-out back into the cell and started speaking to RN Bungard again about the seriousness of his injuries that needed to be looked at and the plaintiff tried to hand RN Bungard the medical cop-out again. Video surveillance will show #38 C/O K. Maybury put his back to the plaintiff's door and blocked RN Bungard from receiving the medical cop-out from the plaintiff while #38 C/O K. Maybury said "She don't want to talk to you, your not getting no medical assistance" and RN Bungard said "I'll come back later to get your Cop-OUt." The Plaintiff watched RN Bungard turn and walk away and said to #38 C/O K. Maybury "I hope you wrote good paperwork, Because my attorney's are gonna eat you up

Page 19 of 33

In court". #38 C/o K. Maybury said "I'm not writing no paperwork, I already got what I wanted, I got to assault you and got away with it. Then he turned and walked away to Catch up with RN Bungard.

On Saturday morning, October 5th, 2019, Video Surveilence will show #33 C/o A. LaShelle trying to block the plaintiff from speaking to #41 RN Vanessa Garcia while the plaintiff Complained about his medical injuries from Cell EO1-135 to Cell EO1-134, with #33 C/o A. LaShelle moving between the Cells. #41 RN Vanessa Garcia Refused the plaintiff medical treatment and refused the medical cop-out (Exhibit H-1), where you will find plaintiff's #41 RN Vanessa Garcia's, RN Kleopping, and RN Miller's finger prints on it, from 7:26 a.m., october 5th, 2019, for #41 RN Vanessa Garcia. RN Vanessa Garcia stated to the plaintiff "I'm the only medical staff member here today, you'll have to wait until monday, I'm just doing pill line." The plaintiff said "it's 7:26 a.m. in the morning. I'm gonna write you up for denial of medical treatment, thank you, have a good day" and #41 RN Vanessa Garcia gave a sly smile and said "your welcome, have a good day" and walked off with #33 C/o A. LaShelle.

90. Please take notice of the facts that Video Surveilence will show #38 C/o K. Maybury did falsify information on a federal document when he wrote in incident Report number 3311917 october 4th, 2019, which is now also Administrative Remedy number 999981-A1 in the Central office in the final stage of being exhausted. which states "On october 4th, 2019 at approximately 7:30 a.m., I was escorting Inmate Vansach, Joseph (17041-424) from Range one to Range one Rec yard, during the duration of this escort the inmate became Verbally aggressive stating "I will kill you on the street and your whole family" as we entered the rec yard the Inmate stated to me "I'm gonna spit in your face mother fucker" he became disruptive and lunged forward and tried to circumvent my escort grip. I placed the inmate on the ground with the least amount of force necessary, due to my safety and the surrounding staff safety from being assaulted by him spitting and pulling away from me". The Video will show I said nothing but good morning several times the plaintiff's mouth didn't move to say that much twice. Next, their is no lunge or Circumventing escort grip. Video will show the officers wanton intentional maliciously reckless assault. #38 C/o Gamble falsified information on a federal memorandum supporting #38 C/o K. Maybury's claim that the plaintiff threatened #38 C/o K. Maybury, but the truth lies in the Video Surveilence on Echo one unit, Echo one Rec yard Video's from above the entrance door and Echo one Video from Rec Cage to between 7:10 a.m. to 7:40 a.m. October 4th, 2019. The Video's will show when #38 C/o K. Maybury and #36 C/o H. Boussag's Spectous Crime Attempt failed, not more than five minutes later. #38 C/o K. Maybury pulled this plardant wanton malicious assault on the plaintiff with deliberate indifference and for retaliation purposes.

91. RN Bungard came back Friday night to retrieve Plaintiff's Cop-out and seen the plaintiff on his hands and knee's in pain, where the Plaintiff's Right testical was the size of a small grape-fruit and he had severe pain coming from his head, hernia and back. RN Bungard said she would put the plaintiff's medical Cop-out in the Computer and e-mail it to RN Ross and #40 M. Bergmann and then RN Bungard looked at the plaintiff's Ppd test from the Cell door window to the plaintiff laying on the floor by the toilet. Those medical Complaints were not in the Plaintiff's medical file, but (Exhibit H-1) is a basic duplicate of the first Complaint given to RN Bungard, but the Ppd test she Checked was documented in the Computer, RN Bungard will Verify the plaintiff gave her a medical cop-out with his medical complaints at 7:00 p.m. October 4th, 2019, and the Video Surveilence will Verify the facts. #41 RN Vanessa Garcia refused to take or address the plaintiff's medical Cop-Out and medical problems on Saturday, October 5th, 2019, at around 7:26 a.m. and RN Kleopping took the same Exhibit H-1, read it and put it back in the Plaintiff's Cell door October 7th, 2019, and told the plaintiff "I'm not taking that" that's how her fingerprints got on it. #40 RN M. Bergmann Came to the Plaintiff's Cell door briefly to speak to the plaintiff but the plaintiff went to the Rec yard to get fresh air and #40 RN M. Bergmann Spoke to Inmate Carmen Gricco 54747-066 about the plaintiff's medical problems at Cell EO1-135. Plaintiff tried to give nurse Miller the medical cop-out (Exhibit H-1) monday night October 7th, 2019, and RN Miller took it, read it and handed it back to the Plaintiff through the Cell door and said to the plaintiff "turn in that medical cop-out to RN M. Bergmann, RN Vanessa Garcia or RN Ross, they need to address that issue" on tuesday morning, October 8th, 2019, #41 RN Vanessa Garcia came to the plaintiff's Cell door at 6:55 a.m. and finally took the plaintiff's medical cop-out which was another duplicate to (Exhibit H-1) for all the plaintiff's injuries. At 3:30 p.m., october 8th, 2019, without seeing the plaintiff or pulling him out the cell to evaluate or assess any of the plaintiff's injuries. #41 RN Vanessa Garcia said to the plaintiff at Cell door EO1-135 "I looked up your accodet, buy over the counter medications for all the injuries you received from your staff assaults". #41 RN Vanessa Garcia was working with #40 RN M. Bergmann to conceal the injuries of the plaintiff from the beatings and assaults he received at the hands of Correcting staff members.

Page 20 of 33

92. Plaintiff's medical file will show #41 RN Vanessa Garcia did a medical encounter on the Plaintiff and notes no pain and no injuries throughout this two page document. But #41 RN Vanessa Garcia and Lt. Murillo both took photo's of the injuries to the plaintiff's face and eye. #41 RN Vanessa Garcia concealed the Plaintiff's injuries from his medical file and tried to assist in covering up the injuries caused by staff assaults on the Plaintiff. The first encounter was at 7:55 a.m. October 4th 2019 and the second encounter was at 9:30 a.m. October 4th, 2019, also mentioning no injuries and no pain. The rest of the medical staff did not log medical assessments from the restraints but the log book will show what's missing from the Plaintiff's medical file when compared with the video surveillence. On October 8th, 2019, #41 RN Vanessa Garcia does a sick call note encounter and marks chief Complaint pain, pain assessment in multiple quality of pain intermittent, pain scale 8 and never at one time, mention the injuries or where they are, or how they happened to the plaintiff.

93. On October 10th, 2019, #24 Lt. Erskine, #28 C/o M. Young, C/o Willmirth, C/o O'Sullivan, C/o White and several other officers, came to the Plaintiff's Cell and told him he had an Attorney Visit. As this group of officers, led by #24 Lt. Erskine, escorted the plaintiff from Echo building to the Visiting room, most of them tried to intimidate the Plaintiff about not mentioning the injuries he received at the hands of defendants #25, #33 #36, #37 and #38 to his attorney or there would be repercussions. Upon the plaintiff's arrival to the visiting cage and seeing Investigator Brad Stallings and Attorney Jill M. Skwor on the other side of the window. Plaintiff stepped into the visiting cage and gave a second to allow #24 Lt. Erskine #28 C/o M. Young and C/o Willmirth take to remove the hard Ambulatory restraints from him and instantly turned around to the Attorney and Investigator and said "I've been assaulted by these officers again and they are trying to cover up this assault like in June and April." #24 Lt. Erskine, #28 C/o M. Young and the rest of the officers started putting their heads down and walking off as the Plaintiff started showing his injuries to Attorney Jill M. Skwor and Investigator Brad Stallings which included the injuries to his head, eye cheek bone, tooth, both wrist, right side rib-cage, lump of swelling on the middle of his spine and the swelling of the severe hernia through his pants. The plaintiff told them about the nerve damage he was suffering from, blurry vision and headaches and he placed three Administrative Remedy BP 8 forms against the visitor window pertaining to paragraphs 87, 88 and 89 of the Civil Complaint for each of them to read the documents before the three of them discussed them. Then Counselor Brotan showed up behind the Plaintiff and said the Plaintiff could turn those three Administrative Remedies in to him. The Plaintiff gave the three BP 8 forms to Counselor Brotan and that was the last time the Plaintiff seen those documents, but, the one in paragraph 87 is Administrative Remedy 994329-A1, the one in paragraph 88 is Administrative Remedy 994331-A1 the plaintiff sent out as sensitive BP 109 with #1B Case Manager D. Dwyer October 7th, 2019 as Certified legal mail when the Plaintiff pushed through to the Central office.

94. When the Plaintiff got back from his attorney Visit, the plaintiff spoke to RN Kristen Bice about his Attorney Visit and them wondering why the injuries the plaintiff received were not being looked at or treated by medical staff. RN Kristen Bice said "put it in a cop-out and she and RN Ross would address the medical problems." On October 11th, 2019, at around 8:46 p.m., Plaintiff was brought down from his Cell to Echo one medical room and medically assessed by RN Kristen Bice with #35 C/o Albertson standing over her trying to intimidate her and the plaintiff, as a second officer stood over by RN Ross limiting the medical staff members from doing their jobs, but in the Plaintiff's medical file, RN Kristen Bice wrote Inmate in an immediate use of force on 10-4-2019, requested medical exam. In pain assessment she put multiple locations, shooting pain and pain level 8. On page 2 of this document, under skin she puts wound serious drainage. She noted five area's of pain in her report that included getting punched in his hernia, brow bone pain and being bruised, lower back spine being swollen, cuts and blisters on the plaintiff's wrist and pain in the right side ribs. This medical report contradicts the medical reports # 41 RN Vanessa Garcia put in the plaintiff's file, which shows the deliberate indifference with malicious intent and medical neglect by #41 RN Vanessa Garcia and #40 RN M. Bergmann as you go further into the Plaintiff's medical file.

95. Dental Supervisor Dr. Song didn't see the plaintiff until 12½ days later, after the assault occurred. But on October 16th, 2019, told the Plaintiff there's a tear in his gum and the tooth could have broken a week ago or a month ago, the tooth was going bad anyways and needed to be removed. In the plaintiff's medical file, Dr. Song put different findings, she wrote to cover up the staff assault on the plaintiff, saying the tooth was broken and rotten over a year. How does she explain the tear in my gum by the broken tooth?, She don't mention it at all, she keeps that information out of the Plaintiff's medical file and the Plaintiff still has

The tooth in his mouth, never fixed, repaired or pulled out of his mouth, just left in pain.

96. Four weeks after the cuts occurred on the plaintiff's wrist, the Plaintiff showed them to RN Kristen Bree and asked her if the wounds on his wrist are normal, and she stated "the healing process is normal, but the wounds are not normal for being in handcuffs or ambulatory restraints, those wounds are not normal for that." The Plaintiff then asked RN Kristen Bree about an incident that happened almost seven months before on April 2nd and 3rd of 2019, and she remembered plaintiff being in four point restraints and complaining about a black eye, and head injuries and she remembered looking at the plaintiff's black eye.

97. The next set of documents is an appeal pertaining to Incident Report number 3311,917, 1203 (threatening) written by #38% K. Maybury October 4th 2019 and is pending in the Central office under Administrative Remedy number 999981-A1 as this Plaintiff writes this Civil Complaint. Exhibits 6-1, 6-2, 6-3 and 6-4 which gives detailed information about the spurious crime by #36% H. Boussa and #38% K. Maybury and gives detailed information about #89% Gamble and #88% K. Maybury falsifying information on federal documents. It also gives detailed information on how DOE hearing officer #18 Case Manager D. Dwyer, #15 DHO Ingram #16 DHO Secretary Fletcher and #81 Counselor Proctor refused to take my statement violated the Plaintiff's fundamental rights to a fair disciplinary hearing process to cover up and conceal multiple assaults on the Plaintiff by federal correctional officers.

98. To continue with the torment, harassment and unprofessional conduct by #38% K. Maybury, following the video surveillance on Echo one Unit with dates and times. You will see wanton deliberate indifference with malicious intent to retaliate against the Plaintiff for exercising his Constitutional rights to exhaust his grievances #38% K. Maybury came around the range on Wednesday, October 16th, 2019, at around 5:30 p.m to 5:35 p.m. and yelled out on the range while walking the tier "Cell one-thirty-six ain't no good, he snitched on all of us", and just walked by the Plaintiff's cell looking in. Carmed Grieco 54747-066 and the Plaintiff were the only inmates living in cell EO1-136. On October 18th 2019, Friday morning, at 7:52 a.m. #38% K. Maybury walks up to Cell EO1-142 and yells towards the Plaintiff's cell EO1-136 saying "keep telling" and he walks back the way he came, never walking towards the Plaintiff's cell. Saturday morning, October 19th, 2019, #35% A. Lashelle was picking up the breakfast trays with #38% K. Maybury and #35% A. Lashelle reaches Cell EO1-138 and #38% K. Maybury reaches Cell EO1-142, they started yelling a conversation to one another. #35% A. Lashelle said "good morning officer Maybury," #38% K. Maybury replied "good morning officer Lashelle," #35% A. Lashelle replied back "we sure do get away with alot around here" and #38% K. Maybury said "fucking right we do." On October 20th, 2019, Sunday morning, during cell rotations that they do every two weeks, they were moving the Plaintiff and Mr. Grieco from Cell EO1-136 to EO1-137 and video surveilence will show #38% K. Maybury is the first officer to go to the plaintiff's cell door at EO1-136 and said looking in the cell door window "Somebody else want to cuff up tather-tots" and walks away from the cell door. Another officer comes to the door and cuffs up the Plaintiff and Mr. Grieco then they call for control to open the cell door two officers pull the Plaintiff and Mr. Grieco to the side for a patdown search. #38% K. Maybury goes into cell EO1-136 first and grabs the Plaintiff's property bag. Carries it across the hall into Cell EO1-137 and lifts it over his head to slam the Plaintiff's property bag on the concrete floor. Then #38% K. Maybury picks up the plaintiff's property bag again and slams it with force on the metal toilet bowl in the cell and the property bag tumbles upside-down to the floor. Then #38% K. Maybury steps outside cell EO1-137 two or three feet and starts taking Mr. Grieco's and the Plaintiff's personal property from the other officers and starts pitching the stuff into cell EO1-137 while saying "Now that's professionalism." #38% K. Maybury said something else to the Plaintiff and the Plaintiff said "you know those camera's are there just as much for you's as they are for us" and another officer put down his head shaking it from side to side and said "stu-pid" while the other officers looked up at the cameras, as they walked the Plaintiff into the cell and the Plaintiff said "thank you" and then Mr. Grieco said "thank you". On Monday morning, October 21st, 2019 during recreation call, #38% K. Maybury came upstairs and started talking trash to Inmate Brown in Cell EO1-138 and to the plaintiff in Cell EO1-137, telling us we better be scared to go to recreation. Something bad is gonna happen to us. Inmate Brown refused to go to recreation, the Plaintiff on the other hand wanted to go outside for fresh air. So he said he's going to recreation. #38% K. Maybury came back to cell door EO1-137 with c/o Parisi (got married and became Mrs. Daughtenbaugh), and as they opened the food slot #38% K. Maybury said to c/o Parisi "you might want to cuff this guy up, he's scared to have me cuff him up", c/o Parisi cuffed up the Plaintiff and escorted the Plaintiff to the recreation cages with her telling the Plaintiff

"I'm not involved with what he has going on," and the Plaintiff told her, "I know, thank you," before C/o Parisi put plaintiff in Rec. Cage #6. After recreation time ended, officers lined up to escort inmates from the recreation cages back to their cells. As #38 C/o K. Maybury was coming through the line, #38 C/o K. Maybury gestured towards the plaintiff and says to the officers and inmates, "you got to watch that guy, he's max custody, he be telling on us, he told on me," and the plaintiff said, "you can't be told on unless your doing something wrong."

99. On November 27th, 2019, The Department of Justice and Federal Bureau of Prisons sent Senator Richard J. Durbin and his senate Aid Seth Jenkins a response letter about all the beatings, assaults, tortures, sexual misconduct remarks, harassment and retaliation that was occurring to the Plaintiff at United States Penitentiary Thomson (see: Exhibit J-1 and J-2), they had internal affairs also investigating this Prison.

100. Plaintiff filed a complaint on third December 4th, 2019, against C/o Willimirth, #28 C/o M. Young and C/o Wiersema for stealing all his stamps and two bags of coffee out of his cell while he was at recreation. This was done in further retaliation against the plaintiff that extends back to when #28 C/o M. Young helped assault the plaintiff with #29 Lt. Erskine and #36 C/o H. Poussaq April 3rd, 2019, and C/o Willimirth was part of damaging and tampering with the plaintiff's mail on June 6th, 2019, with #38 C/o K. Maybury. Coffee and stamps are commissary items bought from the commissary through the Trust Fund and the little bit of funds inmates have on their accounts. Those commissary items should not be damaged, taken, stolen or destroyed by officers or staff members so they could consume the plaintiff's coffee and use the plaintiff's stamps for their personal use, which is considered theft. After counselor Vanpdorp signed the BP 8 form and gave the plaintiff a BP 9 form, the plaintiff filled out the BP 9 form and sent it with the BP 8 form to Education to be legal copied twice, so he could send copies to magistrate Judge Johnston and Attorney Jill M. Skwor December 18th, 2019, by Certified legal mail, the day before he had Video Court and turned in the original to #19 Counselor Vanpdorp after Video Court. That's the last time the plaintiff seen that BP 9 form, but on Video Surveillance, you can see the plaintiff give it to Counselor Vanpdorp through the food slot at his cell door when #19 Counselor Vanpdorp returned plaintiff to his cell. #19 Counselor Vanpdorp made that Administrative Remedy disappear like Counselor Brolon made the three Administrative Remedy forms disappear October 10th, 2019, they both Violated the plaintiff's Constitutional Rights to Exhaust his grievances.

101. On December 19th, 2019, Lt. Williams, #28 C/o M. Young and several officers were coming down the hallway as #19 Counselor Vanpdorp was escorting plaintiff back from Video Court. All of them started shaking white Supremacy and Klu Klux Klan comments to each other and at the plaintiff, right before they saluted each other with some identical sound and hand gesture signal, including the plaintiff's escorting staff member #19 Counselor Vanpdorp. The plaintiff believed it was done as a joke for the plaintiff taking in a black cellly, or they might have been serious, it could go both ways, the plaintiff brushed it off.

102. On Saturday January 4th, 2020, at around between 4:30 p.m. and 5:30 p.m., #31 C/o Mostert and #32 C/o Goynes came to the plaintiff's Cell and asked plaintiff and his Celly if they wanted hair cuts. Eddie Carter said "Yes," and the Plaintiff said "No, I'm listening to the football game" (Buffalo and Houston). After the officers cuffed the plaintiff and his celly, Eddie Carter exited the cell with #32 C/o Goynes and #31 C/o Mostert said to the Plaintiff "you're not going to get a hair cut, but your going to the shower, we're shaking down your Cell." The Plaintiff stepped out of the cell as #31 C/o Mostert said "you know why I'm doing this, you know why I'm doing this, Right," and the Plaintiff said "No, explain it to me." #31 C/o Mostert said "You need to stop filing on us, no more paperwork, you understand," and the Plaintiff stayed quiet and was escorted from Cell G01-141 to the shower Cage and locked in it. Once the plaintiff was placed in the shower Cage, #31 C/o Mostert said "you know why I'm doing this to you don't you," and the plaintiff said "No, break it down for me" and #31 C/o Mostert said "Maybury sends his regards consider this a routine Shakedown." #31 C/o Mostert and #32 C/o Goynes went back to the plaintiff's Cell at G01-141 and searched only the Plaintiff's personal property taking his NBA scores, NFL scores, Sports stats and a letter he was in the process of writing to his attorney Jill M. Skwor about Program Statement P5566.06 Use of force and application of Restraints. Once the plaintiff was placed back in his Cell G01-141, after the search by #31 C/o Mostert and #32 C/o Goynes, the Plaintiff noticed only his personal property was torn up in an unreasonable manner and the plaintiff said to the officers "thank you, I appreciate your hospitality and respect for my personal property," and #31 C/o Mostert said "I'm gonna let you know you're gonna have a long quarter when I work the tier" and the Plaintiff said "are you threatening me," #31 C/o Mostert said "that's what you get for living with niggers." The Plaintiff said "ask Mr. Goynes here, I will be filing a

Complaint about this" and #31% Mostert said "your gonna have a long quarter filing on us, it's gonna be hard on you"; #32% Gaynes and #31% Mostert walked away from the cell and the Plaintiff started cleaning up the unprofessional mess left behind and noticed all his ink pens and envelopes were missing and how they took four bags of coffee out the Plaintiff's personal property bag and stood them up on the Plaintiff's bed.

103. On January 9th, 2020 #35% D. Heim and #37% b. Mullins came to the Plaintiff's cell to take Plaintiff to the shower, as #37% B. Mullins pulled Plaintiff out the cell he whispered to the Plaintiff "don't you believe in white supremacy, he's black your white, your living out-side your race, that's why your having problems with us". There were no other issues or comments between the Plaintiff and #37% B. Mullins that day but why are these officers around me, they filed false reports and false charges against the Plaintiff for assault and threatening them and the Plaintiff filed assault complaints against these officers that are on video surveillance, everybody should see a problem with this, the Plaintiff does.

104. The following day, January 10th, 2020, #34% L. Stringer came to the Plaintiff's cell door and told him "we're doing a routine cell search, cuff up". The officers cuffed up the Plaintiff and his cellie and took them down to the law library around 12:45 p.m., where they were left in the law library until around 2:45 p.m. During that time, #25% D. Heim came over from another unit and searched the Plaintiff's cell with #34% L. Stringer, they took 13 flatbooks of stamps from behind the Plaintiff's daughter's photo and left 2 of those flatbooks & stamps with the Plaintiff's 28 loose stamps the Plaintiff had with his commissary receipts in the other side of his phone book. Then they took a second legal letter the Plaintiff was rewriting to his attorney Jill M. Skwor, two sealed bags of coffee out of his property bag, some other legal material, the rest of his ink pens, a reading book called to hell and beyond by Mack Henry the Plaintiff purchased from bargain books and they vandalized the Plaintiff's cell.

105. The Plaintiff was complaining about his missing legal material, stamps, personal property, pens, envelopes, stamps and reading books stolen by these officers and on video surveilance you can see #25% D. Heim walk out of the Plaintiff's cell with a plastic bag cradled like a football, containing the Plaintiff's coffee, paperwork, his book and other items as he exited the unit as he paused between 5:00 p.m. and 6:00 p.m., Friday night January 10th 2020, after the Plaintiff refused his dinner tray because the officers wouldn't give him back his personal property. #35% Albertson, C/o Troutman C/o Shellhammer and C/o Wiersema came to the Plaintiff's cell door and #35% Albertson said "cuff up, routine shake down" while the Plaintiff was being handcuffed #35% Albertson said "if you want to write us up, you have to suffer the consequences". The Plaintiff said to C/o Albertson "you know I have several complaints against you's for retaliation in the courts and senators office". #35% Albertson said "we don't give a fuck about the courts or the senators office, you need to stop acting like these niggers around here, or we're gonna treat you like the nigger lover you are". Officers took the Plaintiff to the down-stairs shower cage and took his cellie to the upstairs shower cage, then they brought the Plaintiff's personal property bag out of the Plaintiff's cell in B01-141 and placed it in cell B01-101 and #35% Albertson said "now your on hunger strike for refusing your tray". The Plaintiff noticed for the third time they threw away his legal letter he was writing to his attorney, the court and the senator's office, the 28 loose stamps were missing and another bag of coffee was missing with the Plaintiff's cosmetics and medications, some of the Plaintiff's personal items were left behind with his cellie, C/o Shell-hammer and #35% Albertson made comments about inmates writing up officers and what officers do to inmates here at #4 United States Penitentiary Thomson for writing them up and at one point #35% Albertson told the Plaintiff "you know how to spell my name, make sure you spell my name right asshole". The Plaintiff spoke briefly to C/o Troutman and C/o Reixcs with respect and explained the situation to them, before speaking with RN Bungard about the situation and hunger strike. C/o Troutman, C/o Wiersema and RN Bungard had nothing to do with the hunger strike thing, this action of forcing the Plaintiff on hunger strike came from Lt. Reixcs C/o Shellhammer and #35% Albertson in retaliation for the Plaintiff's filings to the courts, senators office and Administrative Remedy Process about all the retaliations, beatings, assaults, tortures, sexual misconduct behavior, thief and damage of his personal property and tampering with his legal mail and Administrative Remedy Process. The Plaintiff complaints about the officers stealing 11 flatbooks of stamps, 28 loose stamps, three bags of coffee, legal material, legal letters and his reading book he purchased, is just more fuel to the fire and the Plaintiff was not given a confiscation slip for any of the missing property stolen by these correctional officers. The Plaintiff used his remaining two flatbooks to send legal letters out to Attorney Jill M. Skwor, Magistrate Judge Johnson,

Senator Richard J. Durbin and Attorney Alan Mills of the Uptown People's Law Center.

**106.** On February 3rd, 2019, the Senator received a second letter from the Department of Justice and the Federal Bureau of Prisons, in response to the retaliations, stolen property and racist comments made by these officers and they claimed Internal Affairs will be investigating these matters ✖ See: Exhibit I-5 letter to Senator Durbins office ✖

**107.** On March 1st, 2020, here are some facts of tormenting, Harassment and provoking by #38 C/o K. Maybury, who the Plaintiff thinks he suffers from narcissism and Bi-polar disorder. During cell retaliations #38 C/o K. Maybury was standing by Cell G03-321 and was talking trash to the Plaintiff behind Cell door G03-320. The first thing #38 C/o K. Maybury said out loud was "Yassach you're snitching on me, I'm not in jail yet, enjoy living in your Closet" The Plaintiff said "I'm done filing complaints, my next thing is a lawsuit, I'm filing" and #38 C/o K. Maybury said "I hope you and wish you would die and the Plaintiff replied "that's good maybe you will stop flirting with me, then" #38 C/o K. Maybury said "I've been reading all your love letters you're sending out" and the Plaintiff realized he's only been sending out Certified legal mail to the Courts, Senator's office and his Attorney's, the only way #38 C/o K. Maybury could be reading those letters is if he was opening the Plaintiff's Certified legal mail the Plaintiff has been turing in to Secretary Ms. DeBarre, who is the one and only person around here that does her job and more than her job to a higher standard properly and professionally. I believe Ms. DeBarre would not give #38 C/o K. Maybury my Certified legal mail to open and read. I do believe #38 C/o K. Maybury could go over to R&D and get those Sealed Certified letters from R&D or the mail room to open and read. I do know he mentioned things I wrote to Attorney Jill M. Skwor and Senator Richard J. Durbin that he wouldn't of known unless he opened and read those letters to them. #38 C/o K. Maybury hinted at further retaliation by himself and other staff members, which proves the facts of harassment and provoking by him for over a year now as of April. Like the Plaintiff said in earlier complaints, it's not if he gets assaulted again, it's when will the Plaintiff get assaulted again by #38 C/o K. Maybury or one of his fellow officers, for the Plaintiff exercising his Constitutional Rights to Redress grievances.

**108.** This wasn't the only threat the Plaintiff took in the passed couple of days, the other day, the Plaintiff stopped #34 C/o L. Stringer at his Cell door G01-321 and Said "We must of got off on the wrong foot, I'm not looking for no problem with you," #34 C/o L. Stringer said "look, officer Mullins is my friend and he said you hit him and I can't over look that, I'm gonna give you what you got coming, nothing more, nothing less, but if I get the opportunity, I'm taking you down. If you lean or do anything in the slightest towards me I don't like, I'm gonna take off on you." Even though I have a high respect level for this officer, that explained the retaliation shake down in paragraph 104 of this Civil complaint and is considered a threat to assault me by #34 C/o L. Stringer if the opportunity arises. #34 C/o L. Stringer is the officer who assisted #35 C/o D. Helm in retaliating against the Plaintiff by stealing his legal material, Stamps and personal property.

**109.** On March 1st, 2020, at around between 10:15 a.m. and 10:30 a.m. C/o Walters and #38 C/o K. Maybury came to the Plaintiff's Cell door serving lunch. The Plaintiff stayed on his bunk preparing legal material for the Court, while his Celly Eddie Carter took the food trays from C/o Walters and then the apples from #38 C/o K. Maybury who said from the door to the Plaintiff laying on his bunk "Yassach," your ass is "mine". Another inmate yelled from across the range "Hey, did he just say your ass is his" and the Plaintiff yelled back "Yes, I think he's bi. Sexual or something" and C/o Walters started laughing while #38 C/o K. Maybury said "Shut the fuck up, I'm coming for you"

**110.** On March 5th, 2020, Plaintiff was taken for an outside Hospital for two hernia surgeries, one above his belly button and one to correct the hernia he got punched in that swelled up his right testicial from when #31 C/o B. Mullins Charlie horse punched him in it.

**111.** On March 6th, 2020, The Plaintiff had an attorney visit with Jill M. Skwor and Investigator Brad Stallings, the Plaintiff's two escorting officers were #25 C/o D. Helm and #38 C/o K. Maybury who should of been on removal status by #1 Department of Justice, #3 Federal Bureau of Prisons and #4 United States Penitentiary Thomson under Policy Statement 3420.11 for his four assaults and one sexual misconduct behavior, he was bound to Violate against The Plaintiff in 977876-A2, 977880-A2, 982571-A1, 982559-A1 and 981198-A1, which is part of why this Plaintiff is filing this Civil Complaint. That's five combined complaints #38 C/o K. Maybury had been found to Violate and should of been fired by the #1 Department of Justice, #3 Federal Bureau of Prisons and #4 United States Penitentiary Thomson after the third Violation why are they allowing him to continue to be a Correctional Staff member and we all would "like to know who struck #31 C/o B. Mullins in the eye? #23 U. D. Murdock or #38 C/o K. Maybury?

112. I have been having several problems filing this Civil Complaint with the Clerk of the Court starting with photo copies from the Education Department for legal copies of this Mentioned Complaint. I was told by the head of Education and legal material supervisor that the Courts are shut down and they will give Inmates extra time for their filings when the Courts open back up again.

113. I have been having problems with #18 Case manager D. Dwyer on filling out the bottom paragraph of page two of the Informa Pauperis Forms the Clerk of the Court sent to the plaintiff to have filled out. Considering he is the authorized personel to complete this form and sign it, and he refuses to complete this form and sign it, stating "You will have to get a court order for me to fill out or sign any paperwork for you" April 4th 2020, I sent the Clerk of the Court copies of the letters I sent to #18 Case manager D. Dwyer and Trust Fund Supervisor Mr. Lee with the In Forma Pauperis Forms, six month statement of my account and Request for Attorney Representation in this Civil Complaint.

114. On April 13th 2020 #32% Gaynes went into my Cell after a incident occurred between the plaintiff and his Celly and #32% Gaynes took the plaintiff's 75 loose stamps for his legal mail that were with the Certified Mail Slips and hard green Signiture cards to delay the plaintiff and he took the plaintiff's 18 Protein, Tylenol, Deodorant, Soap, tooth paste and a tube of Carmex lip balm with an open bag of coffee, that the plaintiff had bought from Commisary. This is more retaliation by #32% Gaynes for the plaintiff exercising his Constitutional Rights to Redress grievances and #32% Gaynes Violated the Policy Statement by not giving the plaintiff a Confirmation form for what he took or for why the reason was for taking the plaintiff's commisary items he purchased, which makes it another thing by this officer to delay the plaintiff from filing his Civil complaint. When I asked #32% Gaynes about my personal property and stamps, he just put his head down the next day.

## IV Claims For Relief
## ✄ COUNT # 1 ✄

Defendant #10 F.B.I. C. Avender, #13 S.I.A. Hansen and #14 S.I.S. Cruze were Special investi-gating agents and are being sued in their individual and official Capacity, at all times Relavent to this action, these three Defendants #10, #13 and #14 were acting under the Color of Federal, State, County and Village law, investigating the Criminal Activities that occurred, in the Prison of, #4 United States Penitentiary Thomson, located in the State of Illinois, County of Carroll and Village of Thomson, where #10 F.B.I. Agent C. Avender #13 S.I.A. Hansen and #14 S.I.S. Cruze were acting on the behalf of #1 Department of Justice, #2 Federal Bureau of Investi-gations, #3 Federal Bureau of Prisons and #4 United States Penitentiary Thomson, working together in a joint operation act of #34 United States Penitentiary Thomson, Under the Umbrella of local county government law of #5 County of Carroll and under the Color of law of the Umbrella of local Village government law #6 Village of Thomson, and under the Color of law with the apparent authority of the prosecuting process of #4 United States Penitentiary Thomson, allowed Defendants #33 Lt. D. Morton, #32% B. Mullins and #38 % K. Maybury to Create a Spacious Crime with falsified information on Federal documents, to try and boot-strap and rail-road prosecute the Plaintiff, to cover up the beating, assaults and tortures of the plaintiff that these officers and other officers did to the plaintiff, in Violations of the Plaintiff's fourth, fifth, sixth, eighth and fourteenth Amendment Rights to the United States Constitution, in Violation of 42 U.S.C. § 1983. These acts of these six Defendants #10, #13, #14, #33, #37 and #38, that Constitutes deprivation of the plaintiff's Civil Rights and are one of the plaintiff's most serious Claims in this Civil Action that includes;

A.) Denial of the fourth and fourteenth Amendment Rights;
i.) by unlawfully and wrongfully seizing the plaintiff's person, causing him threats and un-lawful detention and incarceration on serious Criminal Charge's, that they all knew, or should have known, were false;
ii.) by unlawfully and wrongfully seizing the plaintiff's person, In Clear Violation of the Due Process law embedded in the United States Constitution.

B.) Denial of the fifth and fourteenth Amendment Rights;
i.) by knowingly and willfully submitting false data regarding the transaction that led to the plaintiff's Indictment in Criminal Case No. 19-Cr-50029, in the Seventh Circuit District Court;
ii.) by knowingly and willfully uttering false testimony at the plaintiff's grand jury Indictment to wrongfully prosecute the plaintiff for assaulting an officer the plaintiff did not commit;
iii.) by Conspiring to suborn perjured Correctional officer testimony;
iv.) by knowingly, willfully and wrongfully Concealing information that would assist the Plaintiff's Attorney Jill M. Skwer and Investigator Brad Stallings in the plaintiff's defense against

These serious criminal charges.

C.) Denial of the Plaintiff's Sixth and Fourteenth Amendment Rights;

i.) by failing to timely disclose "Brady" material to the Plaintiff and Plaintiff's Defense counsel and Investigator for the Plaintiff's Defense;

ii.) by failing to timely disclose "Brady" material pertaining to #23 Lt. D. Murton, #37 C/O B. Mullins and #38 C/O K. Maybury's prior history's of assaults beatings tortures, falsifying information and creating spacious crimes in their previous institutions they worked for in the Federal Bureau of Prisons for the Department of Justice;

iii.) by concealing discoverable information from the Plaintiff, Plaintiff's Defense Counsel and Plaintiff's investigator for the Plaintiff's Defense;

iv.) by permitting and encouraging known perjured testimony to be used by #23 Lt. D. Murton, #37 C/O B. Mullins and #38 C/O K. Maybury and use it to illegally and wrongfully try to prosecute the Plaintiff in Case No. 19-cr-50029.

D.) All of this is a wanton, intentional willful, malicious and reckless deliberate indifference to Criminal Intent by these six defendants #10, #13, #14, #23, #37 and #38 which violates the Plaintiff's Eighth Amendment Rights to Cruel and Unusual Punishment truly embedded in the United States Constitution.

E.) Defendants #1 The Department of Justice, #2 Federal Bureau of Investigations, #3 Federal Bureau of Prisons and #4 United States Penitentiary Thomson are responsible for Defendants #10, #13 #14, #23, #37 and #38 which all failed to properly supervise and train these above mentioned Defendants, and through their lack of proper supervision and training, recruiting these individuals to commit some of or all of the acts complained of in Count one of this Civil Complaint.

F.) Defendants #1 The Department of Justice, #2 Federal Bureau of Investigations, #3 Federal Bureau of Prisons, #4 United States Penitentiary Thomson, #5 County of Carroll and #6 Village of Thomson violated the plaintiff's Civil Rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution as followed:

i.) In failing to prevent #23 Lt. D. Murton, #37 C/O B. Mullins and #38 C/O K. Maybury from performing Correctional Officer functions, after learning and thus knowing, these staff members have had a prior history of beating, assaulting and torturing inmates of previous institutions they were working at as staff members of #3 The Federal Bureau of Prisons;

ii.) In failing to prevent #23 Lt. D. Murton #37 C/O B. Mullins and #38 C/O K. Maybury from performing Correctional Officer functions, after learning and thus knowing, these officers have a prior history of falsifying information on Federal documents to cover up their histories of beatings, assaults and tortures of inmates and creating spacious Crimes.

iii.) In failing to prevent defendants #23 Lt. D. Murton #37 C/O B. Mullins and #38 C/O K. Maybury from performing Correctional Officer functions, after learning and/or known, or should have known, these officers have a prior history of mental instabilities, Post Tramatic Stress Syndrom and/or Narcissism disorder.

iv.) In failing to notify the United States Attorney and the Assistant United States Attorney. Of these three defendants #23, #37 and #38 have had a prior history of beating, assaulting, torturing and falsifying information on Federal documents to create spacious crimes against inmates to prosecute them to cover up their Criminal Activities and illegal prosecution of inmates for crimes they did not commit, knowing that these three defendants will be testifying at the plaintiff's Criminal Case/trial set to begin October 19th, 2020, in Criminal Case Number 19-cc-50029, in the Seventh Circuit District Court.

v.) In failing to notify Plaintiff, The Plaintiff's Attorney Jill M. Skwor and Investigator Brad Stallings, The United States Attorney The assistant United States Attorney, The grand jury and the Court that #23 Lt. D. Murton, #37 C/O B. Mullins and #38 C/O K. Maybury were falsifying their case file and creating a specious Crime to try and wrongfully and illegally prosecute the Plaintiff with their wanton, intentional malicious and reckless deliberate indifference.

G.) As a result of the Actions of these six defendants #10, #13, #14, #23, #37 and #38, the Plaintiff was indicted under Indictment number 19-cr-50029, arrested and fingerprinted by the United States Marshall's office and now being forced to stand trial, from which is to start, as of now, on October 19th, 2020, by this Plaintiff's understanding from his Attorney Jill M. Skwor and Investigator Brad Stallings, in Criminal Case Number 19-cc-50029, Seventh circuit District Court.

H.) As a result solely of the Acts of these six mentioned defendants #10, #13 #14, #23, #37 and #38, the Plaintiff is being denied his fundamental Rights, Plaintiff is being deprived of liberty and Plaintiff is being forced to answer to Criminal Charges of the most heinous nature.

I.) The Magistrate Judge Johnston told the Plaintiff on June 14th, 2019, the Plaintiff was looking at not less than one year in prison and not more than seven years in prison

on the first part of count one with a enhanced penalty of not less than seven years and not more than twenty years in prison on the second part of the first count of the Indictment.

J.) In addition of the Eighth Amendment Violation of the United States Constitution, The plaintiff is forced to undergo mental anguish and mental strain over these proceedings and suffers an unlimited amount of deliberate indifference retaliations, assaults, beatings, tortures, sexual misconduct remarks, distruction of his personal property and wasting what little money he receives from his family members for his defense and will bear lasting and permanent mental scars of this ordeal.

K.) The Acts of Defendants #10, #13, #14, #23, #37 and #38 were wanton, willful and intentional, unlawful, malicious, Reckless and Vicious with deliberate indifference, without for the System of Justice in this country, of the United States of America.

## ✳ COUNT #2 ✳

The Federal Bureau of Prisons Acting Director, knew or should have known, that The prison United States Penitentiary Thomson's #12 Former Warden Hudson, has had a long history of denying the Constitutional, Civil and other rights of Prisoners when he worked as warden of United States Penitentiary Lewisburg and the Federal Bureau of Prisons was the Chief Policy maker, such as the acting Director, was on notice of, OR at all times, #12 Former Warden Hudson was hired to be the Warden of United States Penitentiary Thomson, but in deliberate indifference to the Constitutional, Civil and other rights of the prisoners of United States Penitentiary Thomson. The Federal Bureau of Prisons and it's acting director, ignored #12 Former Warden Hudson's History of Violating and acquiescing in violation of the prisoner's and this Plaintiff's Constitutional Rights.

The Prison #4 United States Penitentiary Thomson's #12 Former Warden Hudson has a long history of failing to properly hire, train and discipline Correctional officers and staff members under his command, that the defendant, #3 Federal Bureau of Prisons, Chief Policy maker, such as the acting Director, was on notice of, at the times #12 Former Warden Hudson was hired, but in deliberate indifference to the Constitutional, Civil and other Rights of Prisoners of United States Penitentiary Thomson. The Federal Bureau of Prisons Acting Director, ignored #12 Former Warden Hudson's past failures as a warden, and allowed the following six assaults, beatings and tortures to happen to the plaintiff:

A-1.) On April 2nd 2019, at around between 6:10 p.m. and 6:40 p.m., The Plaintiff Joseph Yansach was peacefully and lawfully sitting in cell E01-101 in said Ambulatory Restraints waiting to be removed from the restraints and placed back in his cell E01-138 and Defendants #23, #37 and #38 approached cell E01-101 to do a Ambulatory Restraint Check. They asked the plaintiff to show the restraints were secured while they looked through the cell door window and they told the Plaintiff to turn around with his back to the door. So they could grab the media chain from behind the plaintiff's back and then called on the radio to have the cell door opened, so they could allegedly do a restraint check.

A-2.) For no reason, and without provocation, Defendants #37 and #38 walked the plaintiff to the center of the cell, while the plaintiff was being peaceful and observing, they violently, unlawfully, intentionally, willfully, maliciously, recklessly and deliberately started beating the Plaintiff with their closed fist causing Serious and Demininis bodily injuries with psychological injuries to the Plaintiff.

A-3.) #23 stood by and witnessed #37 and #38 unlawfully, intentionally, willfully, maliciously, Recklessly and deliberate beating of the plaintiff, but failed to intervene to stop the Violent attack.

A-4.) #37 and #38 acted under the color of Federal, State, County and Village law, pursuant to a custom, policy and practice, in unlawful concert and agreement with #23 to cover up #23's Actions with regard to #37 and #38 Violent, unlawful, intentional, willful, malicious, careless and deliberate indifference beating of the plaintiff, while he was helpless and defenseless, in said Ambulatory Restraints.

A-5.) This entire incident was recorded on several different Institutional Camera's including one that had a clear view into cell E01-101 where the incident occurred.

A-6.) Shortly after being beaten by #37 and #38, Plaintiff Joseph Yansach was Maliciously, abusively and wrongfully charged with a crime as part of the cover up by Defendants #23, #37 and #38.

A-7.) The plaintiff has spent nearly a year so far proving his innocence, during which time, #23, #37 and #38 repeatedly lie about the incident in a attempt to see the plaintiff get's found guilty of a crime for which the plaintiff was absolutely innocent.

B-1.) On April 3rd, 2019, at around 10:15 a.m. and 12:15 p.m., Plaintiff Joseph Yansach, was respectfully and lawfully, laying quietly in four point restraints in the Health Services

Observation room. #24, #28, #36 along with several other officers, entered the Observation Room to allegedly do a restraint check.

B-2.) For No Reason, and without provocation, #24 assaulted the Plaintiff by dropping his knees with his body weight into the shield the other officers were holding the Plaintiff pressed to the bunk with, #36 was torturing the Plaintiff's left hand and wrist Violently and unlawfully, intentionally and willfully, maliciously, Recklessly and deliberately started causing the Plaintiff pain and suffering, causing serious bodily injuries and psychological injuries to the Plaintiff while he was helpless and defenseless, in four point restraints.

B-3.) #28 and other Correctional officers stood by and witnessed #24 and #36 assault and torture the Plaintiff, while they held a transparent shield over the Plaintiff and watched the unlawful, intentional, willful, malicious, Reckless and deliberate assault and torture of the Plaintiff, but failed to intervene to stop this Violent attack.

B-4.) #24, #28, #36 and other officers acted under the Color of Federal, State, County and Village law, pursuant to custom policy and practice, in a unlawful concert and agreement to cover up these assaults and tortures of the Plaintiff, with regard to #24 and #36 Violent, Unlawful, intentional, willful, malicious, reckless and deliberate indifferent assault and torture of the Plaintiff, in a helpless and defenseless position of being in four point restraints.

B-5.) This entire incident was recorded on a Institutional Camera that had a clear view from the corner of the hallway outside the observation room, at the time the incident occurred.

C-1.) On April 3rd, 2019, at around between 2:00 p.m and 2:15 p.m., Plaintiff, Joseph Vansach, was respectfully and lawfully, quiet and yet been removed from four point restraints to hard Ambulatory Restraints by #24 #28 #38 and several other officers leaving the plaintiff barefoot and in paper clothes, to walk across the Compound in the cold, from the health Services medical building to Echo building with ice and snow still on the grass.

C-2.) For no reason and without provocation, #38 kicked the toe of his boot into the bottom of the plaintiff's medically disabled foot several times, while the plaintiff was walking across the Compound in tight hard Ambulatory Restraints barefoot and in paper clothes, while #38 was causing the plaintiff pain and harm in a deliberate indifferent form of Cruel and Unusual Punishment in retaliation with his wanton unlawful, intentional, willful, malicious, Reckless and deliberately started causing pain and suffering to the plaintiff's medical disability to try and cause serious bodily injury and future problems and psychological injuries to the Plaintiff, while he was helpless and defenseless position in hard Ambulatory Restraints.

C-3.) #24 #28 and other unknown Correctional officers stood by and witnessed #38 assault the plaintiff's medically disabled left foot and watched the unlawful, intentional, willful, malicious, Reckless and deliberate assault of the plaintiff, but failed to intervene to stop the Violent attack.

C-4.) #24 #28 and #38 and other officers acted under the Color of Federal, State, County and Village law, pursuant to Custom, policy and practice, in a unlawful Concert and Agreement to cover up these assaults of the plaintiff, with regard to #38 Violent, unlawful, intentional, willful, malicious, Reckless and deliberate indifferent assault of the plaintiff in a helpless and defenseless position of being in hard Ambulatory Restraints.

C-5.) This entire incident was recorded on multiple cameras and video Surveillance covering the sidewalks or the Compound between the buildings, at the time this incident occurred.

D-1.) On June 6th, 2019, at around between 5:05 p.m and 5:25 p.m., Plaintiff, Joseph Vansach, was respectfully and lawfully being removed from his cell for allegedly a routine Cell search by #24, #38 and several other officers, and was pulled to the side of the outside of the cell door for a pat down search by #38.

D-2.) For no reason and without provocation, #38 assaulted the Plaintiff by yanking on his left ear while he pulled the plaintiff's hearing aid out of his left ear Violently and unlawfully, intentionally, willfully, maliciously, recklessly and deliberately caused the Plaintiff pain and suffering to his medical disability causing feminims injury and psychological injuries to the plaintiff while he was in a helpless and defenseless position with his wrist handcuffed together behind his back.

D-3.) #24 and other officers stood by and witnessed #38 assault the plaintiff and watched the unlawful, intentional, willful, malicious, Reckless and deliberate assault on the Plaintiff's medical disability and failed to intervene to stop the Violent Attack.

D-4.) #24 and #38 along with other officers acted under the Color of Federal, state, County and Village law, pursuant to custom, policy and practice, in an unlawful Concert and agreement to cover up this assault on the plaintiff, with regard to #38 Violent, unlawful, intentional, willful, malicious, Reckless and deliberate indifferent assault on the Plaintiff in a helpless and defenseless position of having his wrist secured in handcuffs behind his back.

D-5.) The entire incident was recorded on several Institutional Surveillance Camera's in Frank one Unit at the time the incident occurred.

E-1.) On October 4th,2019, at around between 7:10 a.m. and 7:30 a.m., Plaintiff Joseph Yaasah was being respectful and lawful while #36 and #38 tried and failed to create a specious crime on the plaintiff by putting unsecured handcuffs on the plaintiff's wrist. When #36 and #38 realized their criminal activity trick did not work on the plaintiff, they cuff the plaintiff up and escorted him out to the recreation yard.

E-2.) For no reason and without provocation #38 assaulted the plaintiff by tripping the plaintiff by his medically disabled left foot area and slamming him face and head first into the concrete foundation violently, unlawfully, intentionally, willfully, maliciously, recklessly and deliberately causing the plaintiff pain and harm to the plaintiff's left eye, left cheek bone, tooth and head causing both serious bodily injuries and psychological injuries to the plaintiff while he was helpless and defenseless with his handcuffed behind his back.

E-3.) #29 #36 and other officers stood by and witnessed #38 assault the plaintiff and watched the unlawful, intentional, willful, malicious, reckless and deliberate assault on the plaintiff and failed to intervene to stop this violent attack.

E-4.) #29, #36, #38 and other officers acted under the color of Federal, State, County and Village law pursuant to custom, policy and practice, in an unlawful concert agreement with regard to #39 and #38 giving false information to help cover up this wanton, violent, unlawful assault by #38 who intentionally, willfully, maliciously, recklessly and deliberately assaulted the plaintiff in retaliation for the plaintiff exercising his first Amendment Right to Redress grievances in the United States Constitution. This assault was done to the plaintiff when he was help-less and defenseless with his wrist restrained behind his back in handcuffs and just after the plaintiff avoided the first specious act to assault him five minutes before this assault occurred, do you see the intent and pattern of assaults.

E-5.) The entire incident was recorded on institutional video surveillance in Frank one Unit, Frank one Recreation yard above the entrance/Exit door and the camera from Rec. cage six at all times of this incident.

F-1.) On October 4th,2019, shortly after the plaintiff was assaulted by #38 with the assistance of #39 and #36 the plaintiff was led from the Frank one recreation yard in both hand restraints behind his back and leg irons on his ankles, through Frank one Unit and into Frank one hallway, where the plaintiff was respectfully and lawfully complaining about the assault that just occurred to him for no just cause and #25, #33 and #37 took plaintiff from the escorting officers to place the plaintiff in paper clothes and hard ambulatory restraints for complaining about being assaulted by #38 which was a wanton cruel and unusual punishment for being assaulted without doing nothing wrong.

F-2.) For no reason and without provocation, #37 punched the plaintiff in his right side rib cage, punched the plaintiff in the middle of his back spine area, charlie horse punched the plaintiff in the groin, hit the plaintiff twice in the face and pulled the martin chain so tight around the plaintiff that everybody heard the pop and crack in the plaintiff's lower back while #25 and #33 held the plaintiff throughout this violent and unlawful, intentional, willful, malicious, reckless and deliberate indifferent assault causing severe bodily injuries and psychological injuries to the plaintiff while he was helpless and defenseless being held by two other officers and in restraints.

F-3.) #29,#36 #33 and other officers stood by and witnessed #37 assault the plaintiff while #25 and #33 held the plaintiff and watched the violent unlawful, intentional, willful malicious, reckless and deliberate indifferent brutal assault on the plaintiff, but failed to intervene and stop this violent attack.

F-4.) #25, #29, #33, #36, #37, #38 and along with other officers, acted under the color of Federal, State, County and Village law, pursuant to custom policy and practice, in an unlawful concert and agreement, to cover up this brutal assault on the plaintiff, with regard to #37 who unlawfully, intentionally, willfully maliciously recklessly and deliberately assaulted the plaintiff in retaliation for the plaintiff exercising his first Amendment right to redress his grievances in the United States Constitution and this is considered cruel and unusual punishment to cause harm and pain to the plaintiff who was helpless and defenseless.

F-5.) The entire incident was recorded on a hand held camera, Institutional video surveillance footage in Frank one Unit and Frank Unit hallway at all times of this incident.

The Federal Bureau of Prisons Acting Director or United States Penitentiary Thomson's warden, the Department of Justice, the County of Carroll and Village of Thomson now have an unlawful custom policy and practice of wrongfully, abusively and maliciously assaulting inmates for exercising their constitutional rights to publicly bear witness, publicly comment or show public record of the unlawful actions of these correctional

officers, or inmates will be assaulted, beaten and tortured by these staff members.

## ❋ COUNT #3 ❋

Is based around the Eighth Amendment Rights of the United States Constitution Violations mostly against #40 RN M. Bergmann, and # 41 RN Vanessa Garcia, and partially against # 39 RN L. Starr and maybe other medical staff members for Deliberate Indifference with medical neglect, which will look no further then, Estelle V. Gamble, which says in medical problems act and omissions sufficiently harmful to evidence deliberate indifference to serious medical needs Constitutes Cruel and Unusual Punishment. The deliberate indifferent standard is now being applied to define other kinds of Cruel and Unusual Punishments. Concealing injuries to an inmate who suffered the injuries from staff assaults and not noting the injuries in the plaintiff's medical file is deliberate indifference with malicious intent and test look at the intentions of the medical staff members and/ or medical officials. #39 RN L. Starr, #40 RN M. Bergmann #41 RN Vanessa Garcia and other medical staff members, hid the plaintiff's injuries, did not treat the plaintiff's injuries when they occurred and did not mark the plaintiff's injuries in his medical file and left the plaintiff in pain and suffering with deliberate indifference April 2nd, 2019, April 3rd 2019, June 16th, 2019, and October 4th 2019 with unlawful intentional, willful, malicious, Reckless and deliberate intent. This is a Violation of the Plaintiff's Eighth Amendment Rights of Cruel and Unusual punishment Stapled in the United States Constitution with malicious intent to medical neglect and medical negligence.

At all times these criminal acts occurred to the plaintiff, April 2nd 2019, April 3rd, 2019, June 16th, 2019 and October 4th, 2019, # 39 RN L. Starr, #40 RN M. Bergmann, #41 Vanessa Garcia, and other medical staff members were acting under the Color of Federal, State, County and Village law, pursuant to the Custom, policy and practice, in unlawful Concert and agreement, to cover up the facts of the beatings, assaults and tortures the plaintiff had suffered of the hands of staff assaults to show their deliberate indifference with medical neglect.

## ❋ COUNT #4 ❋

Is based around the Violation of the plaintiff's (Joseph Vansach's) First Amendment Right to file the Federal Bureau of Prisons Administrative Remedy Process by #9 North Central Regional Office Director J.E. Krueger, #12 Former Warden Hudson #18 Unit Manager Meesh, #19 Counselor Vanophor, # 20 Case Manager Wood, #21 Counselor Brolon and #26 C/O Shomo for delaying, hampering, destroying or making Administrative Remedy forms disappear instead of filling and processing them, to help cover up these staff beatings, assaults, and tortures and to persuade the plaintiff to stray away from the actual Administrative Remedy process in Violation of the First Amendment Rights of the United States Constitution.

These seven Defendants #9, #12, #17, #19, #20, #21 and #26 were acting under the Color of Federal, State, County and Village Law, pursuant to the Custom, policy and practice in unlawful concert and agreement, to cover up the facts the plaintiff filed in the Administrative Remedy Forms the plaintiff filled out and turned in to these staff members for redress following the rules, regulations and proper procedures to be illegally denied his Rights

## ❋ COUNT #5 ❋

Is based around Violations of the plaintiff's fourth, fifth, sixth and fourteenth Amendment Rights to the United States Constitution by #15 DHO Ingram, #16 DHO Secretary Fletcher, #18 Case Manager D. Dwyer and #21 Counselor Brolon for bool strapping an institutional charge of Attempted Assault on the plaintiff to cover up the assaults #25, #29, #33, #36, #37 and #38 did to the Plaintiff, revolved around the writing of incident Report number 3311917.

These four Defendants #15 DHO Ingram, #16 DHO Secretary Fletcher, #18 Case Manager D. Dwyer and #21 Counselor Brolon were acting under the Color of Federal, State, County and Village law, pursuant to custom policy and practice, in an unlawful concert and agreement, to cover up the facts in the Disciplinary hearing process to Protect Defendants #25 C/O D. Hein, #29 C/O Gamble, #33 C/O A. Lashelle, #36 H. Boussaa, #37 C/O B. Mullins and #38 C/O K. Maybury from the wanton, intentional, malicious, Reckless and deliberate assaults they did to the plaintiff in retaliation against him.

Page 31 of 33

# ✄ COUNT # 6 ✄

Violations of 42 U.S.C. § 1983 Fourth and Fourteenth Amendments in which the Plaintiff incorporates by reference paragraphs 1 through 114 of this Civil Complaint as if fully set forth here.

The Federal Bureau of Prison's acting Director, United States Penitentiary Thomson's Acting Warden, the County of Carroll and Village of Thomson, have implimented and enforced a practice, policy and custom of tormenting, assaulting, beating and torturing Inmates at United States Penitentiary Thomson, without legal Justification, probable cause or reasonable suspicion of Criminal Conduct, as required under the Fourth Amendment.

The Plaintiff, Joseph Yansach, has suffered Violations of his rights under the Fourth Amendment as incorporated by the Fourteenth Amendment, which were directly and proximately caused by practicies, policies and customs implimented enforced, promoted and developed by these defendants, as set forth in this Civil Complaint.

The Federal Bureau of Prison's acting Director, United States Penitentiary Thomson's Acting Warden, the County of Carroll and Village of Thomson have acted and omitted to Acts with callous disregard and deliberate indifference to the Fourth Amendment Rights of the Plaintiff, Joseph Yansach and as a direct and proximate result of these Acts and omissions of the Defendants in this Civil Complaint, The Fourth and Fourteenth Amendment Rights of the Plaintiff have been Violated.

As a direct and proximate cause of the Acts, Conduct and omissions by these defendants in this Civil Complaint, The Plaintiff's Rights under the United States Constitution were Violated and the plaintiff has suffered and continues to suffer great pain, pain from the injuries, permanent scars from the injuries, including emotional stress, mental anguish, psychological injuries and economic losses. Each of these Defendants should be held accountable for their own actions, along with the governmental Entities they work for and committed these unlawful, intentional, Criminal and Civil Acts against the Plaintiff in Deliberate Indifference.

# ✄⊗ COUNT # 7 ✄

Violation of 42 U.S.C. § 1983 Failure to train, supervise, Audit and discipline, the plaintiff incorporates by reference in paragraphs 1 through 111 of this Civil Complaint, as if fully sets forth here.

Defendants #1, The Department of Justice, #2 Federal Bureau of Investigations, # 3 Federal Bureau of Prisons and #4 United States Penitentiary Thomson, have failed to and were deliberately indifferent to, the need to properly train, supervise, Audit and discipline all the individually named Agents, Director's, warden's, staff members and correctional officers under thier command, including in areas of United States Penitentiary Thomson and it's limitations, racial and minority relations and limitations on thier beatings, assaults, tortures and excessive use of force.

Defendant #1, The Department of Justice, #2 Federal Bureau of Investigations, # 3 Federal Bureau of Prisons and #4 United States Penitentiary Thomson have failed to and were deliberately indifferent to the need to properly train, supervise, audit and discipline all the individually named agents, Director's, Warden's, staff members and correctional officers under thier command In areas involving Inmates First, Fourth, Fifth, sixth, Eighth and Fourteenth Amendment Rights and it's limitations on thier beatings, assaults, tortures and excessive use of force.

As a direct and proximate cause of these acts, Conducts and omissions by the defendants of this Civil Complaint, The Plaintiff's Rights under the United States Constitution were Violated and the plaintiff has suffered and continues to suffer great pain, pain from his injuries, permanent scars from his injuries, including emotional stress, mental anguish, psychological injuries with economic losses.

# ✄⊗ ✄⊗ V Damages and Relief ✄⊗✄

The Plaintiff, Joseph Yansach, incorporates by reference to Paragraphs 1 through 114 and Counts #1 through #7 of this Civil Complaint as if fully set forth here.

As a result of all Acts, Conduct and omissions committed under the Color of Federal, State, County and Village laws, in form of Customs, policies and practices, failure to train, audit, supervise and discipline, and the intentional Acts maliciously, willfully and intentionally committed against The plaintiff's person, The Plaintiff has

suffered harms including but not limited to humiliations, pain, physical injuries, economic loss, loss of liberty, mental anguish, Psychological injuries and violations of his Constitutional Rights.

On all counts and claims for Relief, Plaintiff demands judgment in his favor, and declaratory Relief in the form of declaration that the actions and conduct of all the Defendants were in violation of 42 U.S.C. § 1983, as well as the first, fourth, fifth, sixth, eighth and fourteenth Amendments of the United States Constitution.

On all counts and Claims for Relief, Plaintiff demands judgment in his favor and to award damages jointly and severally, in the amount of not less than forty-seven million one hundred and seventeen thousand, nine hundred and thirty-five dollars and ten cent (47,117,935.10).

On all counts and claims for Relief, Plaintiff demands judgment in his favor and to award punitive damages against each defendant according to the finding of the jury, due to the malicious, willful, oppressive, outrageous and unjustifiable actions and conducts of all these Defendants listed in this Civil complaint.

On all counts and Claims for Relief, Plaintiff demands judgment in his favor and reasonable Attorney fees and interest pursuant to 28 U.S.C. § 1920, 28 U.S.C. § 1961 and 42 U.S.C. § 1988 et seq.

On all Counts and Claims for Relief, Plaintiff demands judgment in his favor and expenses and cost of litigation and interest pursuant to 28 U.S.C. § 1920, 28 U.S.C. § 1961 and 42 U.S.C. § 1988 et seq.

On all counts and claims for Relief, Plaintiff demands judgment in his favor and any other relief the court may deem appropriate and just and otherwise in the interest of Justice.

## ✠ ✱ ✠ VI DEMAND FOR JURY TRIAL ✠ ✱ ✠

On all facts and claims asserted, Plaintiff demands a trial by Jury.

Date: May 4th, 2020

Plaintiff and Petitioner: Joseph Vansach

Reg. No. 17041-424

U.S.P. Thomson

P.O. Box 1001

Thomson Illinois 61285

X ●—Joseph Vansach—

● Signature ●

Page 33 of 33 Joseph Vansach