**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| JOSEPH VAN SACH,<br><br>              Plaintiff,<br><br>    v.<br><br>H. BOUSSAG, KYLE MAYBURY,<br>BRANDON MULLINS, M. YOUNG,<br>DENNIS MURTON, LT. ERSKINE, and<br>JOHN DOEs Nos. 1-18.<br><br>              Defendants. | Case No. 3:20-CV-50180<br><br>Honorable Iain D. Johnston |

**PLAINTIFF'S FOURTH AMENDED COMPLAINT[1]**

Plaintiff Joseph Van Sach ("Van Sach"), by and through his attorneys, Perkins Coie LLP

and Dvorak Law Offices, LLC, respectfully submits this Fourth Amended Complaint against the

following Defendants: Corrections Officer H. Boussag, Corrections Officer Kyle Maybury,

Corrections Officer Brandon Mullins, Corrections Officer M. Young, Lieutenant Dennis Murton,

Lieutenant Erskine, and John Does Nos. 1-18. In support thereof, Plaintiff states as follows:

**Introduction**

1.      This is a civil action for damages pursuant to *Bivens v. Six Unknown Named Agents*

*of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*") arising out of: (1) extensive

physical and emotional injuries deliberately inflicted upon federal inmate Van Sach at United

States Penitentiary Thomson ("USP Thomson") over the course of two days by Defendants, all of

---

[1] Plaintiff initiated this action on May 5, 2020 (Dkt. 1) and submitted amended complaints on July 6, 2020 (Dkt. 14), July 31, 2020 (Dkt. 19), and September 21, 2020. (Dkt. 25.) The Court recruited C. Vincent Maloney as Plaintiff's pro-bono counsel on November 2, 2020 to pursue "any viable federal claims Plaintiff may have stemming from" the events described below. (Dkt. 28.)

whom are U.S. Bureau of Prisons ("BOP") corrections officers; and (2) Defendants' deliberate indifference to Van Sach's serious medical needs.

## Jurisdiction and Venue

2. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and *Bivens*.

3. This Court has jurisdiction over each of the Defendants because each cause of action alleged arises out of a tortious act or omission that occurred at USP Thomson, located in the City of Thomson, Carroll County, Illinois.

4. Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this lawsuit occurred at USP Thomson, located in the City of Thomson, Carroll County, Illinois, which is within this judicial district.

## The Parties

5. Plaintiff Joseph Van Sach is and was at the time of the incidents described below, an inmate at USP Thomson.

6. At all relevant times, Defendant H. Boussag (first name unknown) ("Corrections Officer Boussag") was employed by or under contract with the BOP and/or the United States of America, and worked at USP Thomson. Corrections Officer Boussag is named herein in his/her individual capacity.

7. At all relevant times, Defendant Kyle Maybury ("Corrections Officer Maybury") was employed by or under contract with the BOP and/or the United States of America, and worked at USP Thomson. Corrections Officer Maybury is named herein in his/her individual capacity.

8. At all relevant times, Defendant Brandon Mullins ("Corrections Officer Mullins") was employed by or under contract with the BOP and/or the United States of America, and worked at USP Thomson. Corrections Officer Mullins is named herein in his/her individual capacity.

9.      At all relevant times, Defendant M. Young (first name unknown) ("Corrections Officer Young") was employed by or under contract with the BOP and/or the United States of America, and worked at USP Thomson. Corrections Officer Young is named herein in his/her individual capacity.

10.     At all relevant times, Defendant Erskine (first name or initial unknown) ("Lieutenant Erskine") was employed by or under contract with the BOP and/or the United States of America, and worked at USP Thomson.  Defendant Erskine is named herein in his/her individual capacity.

11.     At all relevant times, Defendant Dennis Murton ("Lieutenant Murton") was employed by or under contract with the BOP and/or the United States of America, and worked at USP Thomson. Defendant Murton is named herein in his/her individual capacity.

12.     At all relevant times, Defendants John Doe Nos. 1-18 were employed by or under contract with the BOP and/or the United States of America, and worked at USP Thomson. Defendants John Doe Nos. 1-18 are named herein in their individual capacities.

### Factual Allegations Applicable to All Counts

#### *BOP Law Enforcement Officers Attack and Punish Van Sach Without Provocation*

13.     Van Sach has been an inmate at USP Thomson since February 2019.

14.     Van Sach suffers from several medical conditions, including having his left index toe amputated and having psoriatic arthritis in his left ankle.

15.     Prior to the events described below, USP Thomson staff posted a notice on or near the door to his cell in Echo-1 Unit informing passersby and prison staff that:

    a.  Van Sach had his left index toe amputated;

    b.  Van Sach suffers from psoriatic arthritis in his left ankle;

    c.  Van Sach's arthritis and missing toe create balance and stability problems; and

    d.  Van Sach was suffering from an abdominal hernia at the time.

16.    During the morning of April 2, 2019, Van Sach got into a dispute with USP Thomson correctional officers not named in this action. As a result of the dispute, such officers placed him in soft-ambulatory restraints and moved him to another cell in Echo-1 Unit.

17.    The soft-ambulatory restraints restrained Van Sach's legs and hands, and were connected together with a waist chain known as a "Martin chain."

18.    Van Sach remained restrained and in the other cell for approximately the next seven hours without incident.

19.    BOP regulations authorize the use of force by a corrections officer against an inmate "only as a last alternative after all other reasonable efforts to resolve a situation have failed." *See* 28 C.F.R. § 552.20.

20.    Even then, corrections officers' ability to use force against an inmate are limited solely to the following situations: to (a) "gain control of the inmate," (b) "protect and ensure the safety of inmates, staff and others," (c) "prevent serious property damage," or (d) "ensure institution security and good order." *See id.*

21.    The same regulations specifically prohibit corrections officers from using force to "punish an inmate." *See* 28 C.F.R. § 552.22(b).

22.    On information and belief, at approximately 6:20 p.m. on April 2, 2019, Corrections Officers Maybury and Mullins came to Van Sach's cell. They were accompanied by a more senior officer, Lieutenant Murton.

23. Upon entering, Corrections Officers Maybury and Mullins moved into the cell and instructed Van Sach to move to the middle of the cell. Lieutenant Murton remained by the entrance to the cell and faced outwards, towards the door.

24. Van Sach moved as instructed, with Corrections Officer Mullins holding the Martin chain connected to the restraints.

25. Corrections Officer Maybury, who stood in front of Van Sach, then instructed Van Sach to raise his hands and permit Maybury to tighten the restraints. Van Sach complied with Corrections Officer Maybury's instruction, allowing him to insert a key into one of the restraints.

26. Corrections Officer Mullins – who was standing behind Van Sach on his left side and still holding the Martin chain connected to Van Sach's restraints – then asked whether Van Sach thought Mullins and Maybury were "soft," to which Van Sach replied "yes."

27. Maybury suddenly released the restraint holding Van Sach's left wrist, causing his hand to become free.

28. Immediately thereafter, and without any provocation, Corrections Officer Mullins – who was standing behind Van Sach on his left side and still holding the Martin-chain connected to Van Sach's restraints – struck Van Sach with a closed-fisted, "windmill" punch, landing on or around Van Sach's left eye.

29. Corrections Officer Maybury then punched Van Sach with a closed fist several times near Van Sach's mouth.

30. The punches caused the defenseless Van Sach to stumble backwards toward the toilet in the cell. Despite being partially restrained, Van Sach raised his free left hand in a feeble effort to protect himself from Corrections Officer Maybury's and Corrections Officer Mullins' blows and show that he was submitting to their displays of force.

31.     Corrections Officer Maybury and Corrections Officer Mullins disregarded Van Sach's raised hand. Instead, they continued to viciously beat Van Sach's face and head with closed fists, landing at least eight blows.

32.     Van Sach – who was in substantial pain – fell to the floor in his restraints and pushed himself under one of the beds in the cell for protection.

33.     Lieutenant Murton, who was in a supervisory position over Corrections Officer Mullins and Corrections Officer Maybury, had a reasonable opportunity to prevent the beating before it occurred and during its commission, but instead turned a blind eye toward his subordinates' misconduct and failed to intervene until after Van Sach was under the bed.

34.     Corrections Officer Mullins and Corrections Officer Maybury also had a reasonable opportunity to prevent each other from harming Van Sach, but each failed to do so.

35.     Following Corrections Officer Mullins' and Corrections Officer Maybury's attack, Corrections Officers G. Arroyo and A. Shaffer entered the cell while Van Sach was still under the bed.

36.     Van Sach informed Arroyo and Shaffer that his left hand was free before leaving the shelter provided by the bed. Van Sach then slowly stood up and allowed Arroyo to put his left hand back into the soft-ambulatory restraints without dispute.

37.     During the entire encounter described above, Van Sach never struck or attempted to strike Corrections Officer Maybury, Corrections Officer Mullins, or Lieutenant Murton. Moreover, Van Sach's legs and right arm were restrained, making him no threat to any of the Corrections Officers present; to any other inmates, staff, or prison property; or to the security or good order of the prison. The use of force was, therefore, punitive, excessive, and legally unjustifiable.

38.     As a result of this attack, Van Sach sustained a severe headache, a black eye, a lump on his head, and bruises and cuts to his ankles and wrists.

***Defendants Unlawfully Hold Van Sach Overnight in Tight, Unnecessary Four-Point Restraints, Deny Him Opportunities to Use the Toilet, Deny Him Necessary Medical Care for His Serious Injuries, and Brutally Beat Him[2]***

39.     Federal regulation authorizes the use of restraints only when "necessary to gain control of a prisoner who appears to be dangerous because the prisoner: (a) assaults another individual, (b) destroys government property, (c) attempts suicide, (d) inflicts injury upon self, or (e) becomes violent or displays signs of imminent violence." *See* 28 C.F.R. § 552.20.

40.     Federal regulation also specifically prohibits the application of *any* restraints (a) as "a method of punishing an inmate," (b) "in any manner which restricts blood circulation," or (c) "[i]n a manner that causes unnecessary physical pain or extreme discomfort." *See* 28 C.F.R. § 552.22(h).

41.     The use of four-point restraints is heavily regulated and, under proper conditions, rarely employed. Indeed, federal regulations prohibit the use of four-point restraints by BOP employees unless, *inter alia*: (a) soft-ambulatory restraints were previously ineffective in restraining an inmate, (b) the inmate is placed on a bed with a mattress in clothing appropriate to the temperature, (c) the inmate is provided with a sheet or blanket, ***and*** (d) the inmate is allowed to use the toilet every two hours. *See* 28 C.F.R. § 552.24.

42.     As with all restraints, four-point restraints also cannot be used as a means of punishment. *See* 28 C.F.R. § 552.22(h)(1).

43.     At approximately 6:40 p.m. on April 2, 2019, Lieutenant Murton and Corrections Officers A. Shaffer, G. Arroyo, J. Keller, B. Walden, and P. Gomez rolled Van Sach from Echo-1

---

[2] On information and belief, the practices described below are routinely used at Thomson to retaliate against inmates and punish them. This routine practice has been the subject of numerous internal grievances and lawsuits in this Court.

Unit to the Health Services Building on a gurney, placed him in observation cell A1-14, and secured him in four-point restraints.

44. Nurse M. Bergmann ("Bergmann") then conducted a cursory medical examination and restraint check. Van Sach alerted Nurse Bergmann to the facts that (a) the four-point restraints were too tight, (b) his head was ringing, (c) his left eye was throbbing, and (d) he needed medical treatment. He also requested that his restraints be loosened and to use the toilet. Van Sach's requests were ignored, and the BOP officials left the observation cell.

45. Defendants and other BOP corrections officers and medical personnel conducted many more restraint checks over the course of the next twenty hours. During each encounter, Van Sach pleaded for medical care, to have the four-point restraints loosened, to use the toilet, and (when applicable) to be provided fresh clothes. But instead of coming to his aid, Defendants and other BOP corrections officers and medical personnel ignored or denied *every* such request.

46. Moreover, during that time, Van Sach's constitutional rights and basic human dignity were repeatedly and grossly violated by Defendants in myriad ways.

47. Among other things, and as discussed in detail below:

   a. Van Sach was physically attacked again by multiple BOP officials during two restraint checks;

   b. Van Sach remained in substantial pain and unable to sleep as his overly tight restraints were either not adjusted or tightened, despite his repeated requests that they be loosened;

   c. Van Sach was never offered food or water;

   d. Van Sach was not given any explanation as to why the soft-ambulatory restraints were ineffective – nor could any reasonable explanation be given;

   e. Van Sach was not given clothing appropriate to the temperature – he was only provided with paper medical garments and a paper sheet; and

f.   Van Sach was not given the opportunity to use the toilet every two hours. Far from it. Van Sach's repeated requests to use the toilet were denied or ignored at various times, forcing Van Sach to urinate upon and soil himself and his paper sheets and garments multiple times.

48.   At approximately 7:15 p.m. on April 2, 2019, Lieutenant Murton returned to the observation cell, accompanied by Corrections Officers Maybury, Mullins, J. Keller, A. Shaffer, G. Arroyo, B. Walden, and P. Gomez, as well as Bergmann.

49.   Van Sach alerted those present to the facts that (a) the four-point restraints were too tight, (b) his head was ringing, and (c) his left eye was throbbing. He requested medical treatment, that his restraints be loosened, and to use the toilet.

50.   Lieutenant Murton instructed Van Sach not to talk to Bergmann. Bergmann then falsely concluded that the four-point restraints were correctly applied and did not offer any medical treatment. And none of the BOP officials present loosened Van Sach's restraints or permitted him to use the toilet before leaving the observation cell.

51.   On information and belief, Corrections Officer A. Shaffer recorded a video of Van Sach secured to the bed in four-point restraints during the 7:15 p.m. encounter.

52.   On information and belief, Defendant Murton took a photograph during the 7:15 p.m. encounter demonstrating that Van Sach's hands were already discolored from lack of circulation caused by the four-point restraints.

53.   At approximately 8:40 p.m. on April 2, 2019, Nurse Vanessa Garcia ("Garcia"), Lieutenant McDowell (first name or initial unknown) and several unidentified corrections officers entered Van Sach's observation cell ("John Doe No. 1," "John Doe No. 2," and "John Doe No. 3") to conduct another restraint check.

54. As he had with Bergmann, Van Sach alerted Garcia to each of the injuries described above and asked for medical treatment. He also requested that his restraints be loosened and asked to use the toilet.

55. Garcia then falsely concluded that the four-point restraints were correctly applied but did not offer any medical treatment. And none of the BOP officials present loosened Van Sach's restraints or permitted him to use the toilet, as is required by federal regulation.

56. At some point after the 8:40 p.m. encounter, Van Sach urinated on himself because he was not permitted to use the toilet.

57. At approximately 10:40 p.m. on April 2, 2019, Garcia, Lieutenant McDowell, and several unidentified corrections officers ("John Doe No. 4," "John Doe No. 5," and "John Doe No. 6") entered Van Sach's observation cell to conduct another restraint check.

58. As he had two hours before, Van Sach alerted Garcia to each of the injuries described above and asked for medical treatment. Van Sach also requested that his restraints be loosened, that he be permitted to use the toilet, and that his soiled clothes and sheets be replaced.

59. In response, McDowell threatened Van Sach, telling him not to speak to Garcia, and said that Van Sach just "had to suffer through" any pain caused by the tightness of the restraints.

60. Garcia falsely concluded that the four-point restraints were correctly applied but did not offer any medical treatment. And none of the BOP officials present loosened Van Sach's restraints, changed his soiled clothes and sheets, or permitted him to use the toilet, as is required by federal regulation.

61. At approximately 12:15 a.m. on April 3, 2019, Bergmann, Lieutenant B. McCoic, and other unidentified BOP corrections officers ("John Doe No. 7," "John Doe No. 8," and "John Doe No. 9"), entered Van Sach's observation cell to conduct another restraint check.

62. Again, Van Sach alerted Bergmann to each of the injuries described above and asked for medical treatment, this time noting that the vision in his left eye was becoming blurry. Van Sach also requested that his restraints be loosened, that he be permitted to use the toilet, and that his soiled clothes and sheets be replaced.

63. Bergmann again falsely concluded that Van Sach's four-point restraints were safely applied but did not offer any medical treatment. And none of the BOP officials present loosened Van Sach's restraints, changed his soiled clothes and sheets, or permitted him to use the toilet, as is required by federal regulation.

64. On information and belief, at approximately 2:15 a.m. on April 3, 2019 and, again, at approximately 4:15 a.m. on April 3, 2019, Bergmann, accompanied by Lieutenant B. McCoic, conducted additional restraint checks. During both encounters, Van Sach again alerted Bergmann to his injuries and asked for medical treatment. He also requested that his restraints be loosened, that he be permitted to use the toilet, and that his soiled clothes and sheets be replaced.

65. During both encounters, Bergmann again falsely concluded that Van Sach's four-point restraints were safely applied but did not offer any medical treatment. And neither she nor McCoic loosened Van Sach's restraints, changed his soiled clothes and sheets, or permitted him to use the toilet, as is required by federal regulation.

66. At some point after the 4:15 a.m. encounter, Van Sach urinated on himself again because he was not allowed to use the toilet.

67.     At approximately 6:30 a.m. on April 3, 2019, Nurse Kristen Bice ("Bice") conducted a restraint check, accompanied by Lieutenant D. Behle. As he had with Bergmann and Garcia, Van Sach alerted Bice to each of the injuries described above and asked for medical treatment. He also requested that his restraints be loosened, that he be permitted to use the toilet, and that his soiled clothes and sheets be replaced.

68.     Bice verbally noted that Van Sach had a "black eye," a "lump on [his] head," and "some marks on" him, but did not provide any treatment or include these statements in Van Sach's medical records. And neither she nor Lieutenant D. Behle loosened Van Sach's restraints, changed his soiled clothes and sheets, or permitted him to use the toilet, as is required by federal regulation.

69.     At approximately 7:30 a.m. on April 3, 2019, Van Sach urinated on himself again because he had not been allowed to use the toilet.

70.     On information and belief, Nurse Kloepping (first name unknown) ("Kloepping"), Lieutenant Erskine and Corrections Officers Young and R. Kaufman, entered the observation cell at approximately 8:15 a.m. on April 3, 2019 to conduct a restraint check and administer previously prescribed medication.

71.     Lieutenant Erskine brought a receptacle for Van Sach to urinate in but did not offer it to Van Sach, instead leaving it outside the cell. He stated that Van Sach did not need it because he had already urinated on his clothes and paper sheet.

72.     As he had with Bergmann, Garcia, and Bice, Van Sach alerted Kloepping to each of the injuries described above and asked for medical treatment. He also requested that his restraints be loosened, that he be permitted to use the toilet, and that his soiled clothes and sheets be replaced.

73.    Kloepping administered Van Sach's medication but did not otherwise offer any medical treatment or note this encounter in his medical records. And neither she, Erskine, Corrections Officer Young, nor Corrections Officer R. Kaufman loosened Van Sach's restraints, changed his soiled clothes and sheets, or permitted him to use the toilet, as is required by federal regulation.

74.    And foreshadowing what was to come, Lieutenant Erskine deliberately squirted Van Sach in the face with water from a bottle that he was supposed to use to assist Van Sach in swallowing his medication. Indeed, Lieutenant Erskine asked Kloepping during the visit if he could keep the bottle to use as a weapon against other inmates.

75.    At approximately 8:15 a.m. on April 3, 2019, an unknown BOP official finally changed Van Sach's soiled paper medical garment and sheets, but not the soiled mat under him.

76.    At no point from 6:40 p.m. on April 2, 2019 through 8:15 a.m. on April 3, 2019 did Van Sach assault anyone, destroy government property, attempt suicide, inflict any injury upon himself, become violent, or display signs of imminent violence. Soft-ambulatory restraints also had not proven ineffective. And, during that entire time, Van Sach was held in unnecessarily tight four-point restraints, which (a) caused Van Sach unnecessary physical pain and extreme discomfort, (b) forced him to remain in soiled clothes while lying under a soiled sheet, and (c) denied him access to a toilet. The application of four-point restraints was, therefore, punitive and unlawful.

### *Defendants Boussag, Young, and Erskine Physically Assault a Restrained, Injured, and Defenseless Van Sach[3]*

---

[3] On information and belief, the practices described below are routinely used at Thomson to retaliate against inmates and punish them. This routine practice has been the subject of numerous internal grievances and lawsuits in this Court.

77.     For some of the Defendants, painfully and unlawfully restraining Van Sach, denying him the use of a toilet, and denying him medical care for his serious injuries for more than 15 hours was apparently not enough.

78.     On information and belief, at approximately 10:15 a.m. on April 3, 2019, Lieutenant Erskine, Corrections Officer Boussag, and Corrections Officer Young entered Van Sach's observation cell for what, on its face, appeared to be another periodic restraint check. This time, however, they did not come with medical personnel. Instead, Corrections Officer McClain (first name or initial unknown) and three unidentified BOP corrections officers dressed in riot gear accompanied them ("John Doe No. 10," "John Doe No. 11," and "John Doe No. 12").[4]

79.     At Lieutenant Erskine's direction, Corrections Officers Boussag and Young then tightened the restraints holding Van Sach's arms, which at this point he had been wearing for more than 15 hours, causing further pain to his already-battered body.

80.     Also acting at Lieutenant Erskine's direction, John Doe No. 10, John Doe No. 11, and John Doe No. 12 stood at the foot of the bed and one of them tightened Van Sach's leg restraints.

81.     Van Sach had advised Lieutenant Erskine during two earlier encounters that his restraints were already too tight. Lieutenant Erskine nonetheless ordered his subordinates to intentionally cause Van Sach further pain and discomfort.

82.     Van Sach also asked to use the toilet. Lieutenant Erskine denied this request, telling Van Sach that he would have to urinate on himself.

83.     As Van Sach laid in this bed, without proper clothing or other protection, in overly tight restraints that were just tightened again, unable to use the toilet, and still injured and in pain

---

[4] Corrections Officer McClain refused to participate in the incident described below.

-14-

from the unprovoked assaults on him the night before, Corrections Officers Boussag and Young – at Lieutenant Erkine's direction – placed a long, plastic shield tightly on top of Van Sach's thighs, torso, and head.

84. With Corrections Officers Boussag and Young applying pressure to hold the shield down, Lieutenant Erskine – who was standing at the head of the bed – placed his hands on the plastic shield and began applying downward pressure, smashing it into Van Sach's head and body.

85. But putting additional physical pressure on an injured, restrained, defenseless inmate in his care was apparently not enough for Lieutenant Erskine. So, he then leaped into the air and slammed his left knee into the portion of the shield directly over Van Sach's head.

86. This caused Van Sach – who was already suffering from head pain and trauma from the unprovoked beating that Corrections Officers Maybury and Mullins subjected him to the night before – to incur further severe head injury.

87. Lieutenant Erskine repeated the act of driving his knee into the plastic shield atop Van Sach's head several times. As this happened, Corrections Officers Boussag and Young continued to hold down the shield, doing nothing to stop Lieutenant Erskine or each other. And John Doe No. 10, John Doe No. 11, and John Doe No. 12, who could all see this happening, did nothing to stop it either.

88. As Lieutenant Erskine drove his knee into the plastic shield, he shouted at Van Sach that Corrections Officer Mullins (who had viciously beaten a restrained Van Sach the night before, out of apparent retaliation for Van Sach calling him "soft") is his relative.

89. After Lieutenant Erksine's barrage of blows to Van Sach's head came to an end, the officers removed the plastic shield from Van Sach's body and left the observation cell. Before leaving, they did not call for medical assistance, did not loosen the now-tighter four-point

-15-

restraints, did not give Van Sach the opportunity to use the toilet, and did not offer or provide aid for Van Sach's existing injuries.

90. At some point after the 10:15 a.m. encounter, Van Sach urinated on himself because he was not allowed to use the toilet.

91. At approximately 12:15 p.m. on April 3, 2019, Lieutenant Erskine, Corrections Officer Young, and Corrections Officer Boussag returned to the observation cell, accompanied by three more unidentified BOP employees ("John Doe No. 13," "John Doe No.14," and "John Doe No.15").

92. Although the restraints remained tightened from the 10:15 a.m. assault, Lieutenant Erskine once again instructed his subordinates to tighten Van Sach's four-point restraints.

93. In response, Corrections Officer Boussag took Van Sach's left hand out of the restraint, twisted it so that his palm was almost facing the bed, and locked his hand and wrist tightly back in the restraint, laughing as he did so.

94. Almost immediately, Van Sach's left hand began to swell and change color.

95. As Van Sach's left hand went from red to purple to white, Lieutenant Erskine exclaimed: "Oh shit, take his hand out of the cuff!"

96. Corrections Officer Boussag did as Lieutenant Erskine instructed and placed Van Sach's left hand back in the restraint with his palm facing upwards. Corrections Officer Boussag then tightened the restraint significantly. As this happened, Corrections Officer Young, John Doe No.13, and John Doe No.14 tightened the restraints on Van Sach's remaining limbs.

97. With Van Sach now even more-painfully restrained, Corrections Officers Boussag and Young, as before, pulled out a long plastic shield and secured it over Van Sach's head and body.

98.     Lieutenant Erskine – who was again standing at the head of the bed – pressed one hand against the plastic shield, causing it to hit Van Sach in the head.

99.     Lieutenant Erskine then, as before, leaped into the air and slammed his left knee into the portion of the shield directly over Van Sach's head. This caused Van Sach – who was already suffering from head pain and trauma from being battered the night before and two hours earlier – to incur further severe head injury.

100.    Lieutenant Erskine repeated the act of driving his knee into the plastic shield atop Van Sach's head several times. As this happened, Corrections Officers Boussag and Young continued to hold down the shield. John Doe No. 13, John Doe No. 14, and John Doe No. 15, who could all see this happening, did nothing to stop it.

101.    After Lieutenant Erksine's barrage of blows to Van Sach's head came to an end, the officers removed the plastic shield from Van Sach's body and left the observation cell. Before leaving, they did not call for medical assistance, did not loosen the now-tighter four-point restraints, did not give Van Sach the opportunity to use the toilet, did not request that Van Sach's soiled garments and sheet be changed, and did not offer or provide aid for Van Sach's existing injuries.

102.    During both the 10:15 a.m. and 12:15 p.m. encounters on April 3, 2019, Van Sach posed no threat to Erskine, Boussag, Young, or the other BOP employees present. Van Sach did not present a threat to his fellow inmates, BOP property, or to the security or good order of the prison either. The use of force by Lieutenant Erksine, Corrections Officer Boussag, Corrections Officer Young, and the aforementioned John Does was, therefore, punitive, excessive, and unjustifiable. And for the reasons noted above, the continued application of four-point restraints was punitive, excessive, and unlawful as well.

***Return to Echo-1 Unit***

103.    At approximately 2:00 p.m. on April 3, 2019, Lieutenant Erskine, Corrections Officer Maybury, Corrections Officer Young, and multiple unidentified officials ("John Doe No. 16," "John Doe No. 17," and "John Doe No. 18") returned to the observation cell. Several of these officials were again wearing riot gear.

104.    After entering, the officers removed Van Sach from the four-point restraints, replaced his soiled paper medical garments with new paper medical garments, and placed him in hard-ambulatory restraints.

105.    One of the officers informed Van Sach that he would now be returned to a cell in Echo-1 Unit – a trip that would require Van Sach to walk outside for a distance of approximately two city blocks.

106.    Van Sach requested that the officers provide him with shoes and warmer clothing for the journey.

107.    According to the National Weather Service, the average temperature that day in nearby Mount Carroll, Illinois (the closest weather station to USP Thomson) was 36° F.[5]  The high temperature for that day in Mount Carroll was 49° F.[6]

108.    The BOP officials present, however, refused to provide Van Sach with climate-appropriate clothes or shoes, even after Van Sach requested the same. Indeed, in response to Van Sach's request, Lieutenant Erskine exclaimed: "You get what you've got on. That's it, nothing more or less."

109.    The officers then escorted Van Sach back to Echo-1 Unit from the observation cell.

---

[5] Available at https://www.weather.gov/wrh/Climate?wfo=dvn.
[6] *Id.*

110. Once outside, Corrections Officer Maybury began walking behind Van Sach and kicked Van Sach's bare left foot and ankle several times, causing Van Sach to stumble.

111. While this was happening, Lieutenant Erskine told Van Sach not to "start anything," as he was almost back in Echo-1 Unit.

112. At all times during the journey back to Echo-1 Unit, Van Sach wore hard-ambulatory restraints. Van Sach posed no threat to Lieutenant Erskine, Corrections Officers Maybury and Young, other BOP employees, fellow inmates, BOP property, or the security or good order of the prison. Corrections Officer Maybury's use of force was, therefore, punitive, excessive, and legally unjustifiable. And as Corrections Officer Maybury's supervisor and colleagues, Lieutenant Erskine, Corrections Officer Young, John Doe No. 16, John Doe No. 17, and John Doe No. 18 failed to intervene.

113. As noted above, Van Sach's left index toe was previously amputated, and he suffers from psoriatic arthritis in his left ankle. Both of these conditions, individually and in combination, create stability and balance problems for Van Sach.

114. Corrections Officer Maybury knew of these conditions when he repeatedly kicked Van Sach's left foot and ankle because of the notice posted on Van Sach's cell door. Corrections Officer Maybury was, therefore, deliberately indifferent to Van Sach's serious medical needs, as were Lieutenant Erskine, Corrections Officer Young, John Doe No. 16, John Doe No. 17, and John Doe No. 18, who all had the present ability to prevent Corrections Officer Maybury's conduct but did not do so.

115. Lieutenant Erskine, Corrections Officer Maybury, Corrections Officer Young, John Doe No. 16, John Doe No. 17, and John Doe No. 18 escorted Van Sach back to his cell block but

did not place him in his regular cell. He remained in an alternate cell, in hard-ambulatory restraints, for at least six more hours.

116.    At approximately 4:30 p.m. on April 3, 2019, Lieutenant Murton entered the alternate cell with his Billy-club drawn and threatened Van Sach with it, telling him that he "better not file." Van Sach understood Lieutenant Murton as referring to filing internal grievances, requests for administrative relief, and/or lawsuits.

117.    At approximately 8:30 p.m. on April 3, 2019, Van Sach was transferred to a new cell (by Lieutenant Murton and two other BOP officers whose identity he does not recall), where the hard-ambulatory restraints were finally removed.

118.    Murton drew his Billy-club, again, at this point and threatened Van Sach. Murton also directed that Van Sach be left in paper clothes, on a raw mattress with no sheets or blankets, without regard for the temperature.

119.    Because Van Sach had not assaulted anyone, destroyed government property, attempted suicide, inflicted any injury upon himself, become violent, or displayed signs of imminent violence, the continued application of hard-ambulatory restraints after Van Sach returned to Echo-1 Unit was punitive and unlawful.

### *Aftermath*

120.    As a result of the incidents described above, Van Sach sustained a black eye, a lump on his head, a severe headache that lasted for days, and scarring on his wrists and ankles from cuts that remained open wounds for approximately one month.

121.    Even after his physical wounds healed, Van Sach has continued to suffer from debilitating anxiety, which manifests as insomnia and trembling at the thought of encountering Defendants.

122. Van Sach has exhausted BOP's administrative-remedy request process with respect to each of the incidents described above. Van Sach's claims are therefore ripe for adjudication by this Court.

### Causes of Action

### Count I - *Bivens* Action - Eighth Amendment/Excessive Force/Failure to Intervene/Supervisory Liability
### (Defendants in Their Individual Capacities)

123. Van Sach restates the allegations contained in the foregoing Paragraphs as if fully stated herein.

124. At all relevant times, Defendants were federal employees and/or agents acting under color of federal law.

125. The Eighth Amendment to the United States Constitution protects Van Sach, a federal inmate, from being subjected to cruel and unusual punishment while in the custody of the United States.

126. Defendants were aware, or should have been aware, that, **after** he was initially restrained during the morning of April 2, 2019, Van Sach **never** acted in such a manner that would justify the use of force or continuing application of restraints under 28 C.F.R. § 552.20 *et seq*.

127. Defendants' conduct (described above), in violation of federal laws governing both the use of force and restraints against federal inmates, including, without limitation, the following, was thus punitive and excessive, served no legitimate penological interest, was committed maliciously and sadistically to cause Van Sach harm, and constituted the unnecessary and wanton infliction of pain:

    a. The decision to leave Van Sach in soft-ambulatory restraints for seven hours during the afternoon and evening of April 2, 2019;

b. Corrections Officer Mullins' and Corrections Officer Maybury's violent, unprovoked attack on Van Sach while he was restrained during the evening of April 2, 2019;

c. Defendants' unnecessary and unlawful application of four-point restraints on April 2, 2019 and April 3, 2019, including their refusal to loosen or remove those restraints;

d. Defendants' denial of Van Sach's multiple requests to use the toilet while in four-point restraints on April 2, 2019, and April 3, 2019;

e. Defendants' failure to provide Van Sach with appropriate clothing, food, or water while in four-point restraints on April 2, 2019 and April 3, 2019;

f. The violent, unprovoked attacks on Van Sach in the observation cell on April 3, 2019 by Lieutenant Erskine, Corrections Officer Boussag, Corrections Officer Young, and certain John Doe Defendants;

g. The failure to provide Van Sach with appropriate clothing before forcing him to walk barefoot outside back to Echo-1 Unit on April 3, 2019;

h. Corrections Officer Maybury kicking Van Sach's feet while Van Sach walked through the prison complex on April 3, 2019; and

i. The decision to leave Van Sach in hard-ambulatory restraints for six hours during the afternoon and evening of April 3, 2019 after returning him to Echo-1 Unit.

128. At various times, each Defendant also knew that Van Sach was being subjected to the excessive use of force and had the realistic opportunity to prevent such excessive force, but each failed to take any actions to prevent this from occurring.

129. Additionally, Lieutenants Murton and Erskine were supervisors who knew their subordinates were using excessive force but turned a blind eye toward the use of such force.

130. Defendants, therefore, used unconstitutional excessive force against Van Sach, in violation of his right under the Eighth Amendment to the United States Constitution not to be cruelly and unusually punished.

131. As direct and proximate results of Defendants' collective and individual violations of Van Sach's constitutional rights, Van Sach unnecessarily suffered, and continues to suffer from, enduring physical and emotional injuries, causing him damages in an amount to be proven at trial.

### Count II - *Bivens* Action - Eighth Amendment/Deliberate Indifference to Serious Medical Needs
### (Defendants in Their Individual Capacities)

132. Van Sach restates the allegations contained in the foregoing Paragraphs as if fully stated herein.

133. At all relevant times, Defendants were federal employees or agents acting under color of federal law.

134. The Eighth Amendment to the United States Constitution protects Van Sach, a federal inmate, from being subjected to cruel and unusual punishment while in the custody of the United States.

135. Despite Van Sach's repeated pleas to loosen the restraints he was wrongfully placed in, each of the Defendants either *tightened the restraints* or failed to ensure Van Sach's restraints were loosened, and at no point did any of them notify medical staff at USP Thomson.

136. Despite knowing that Van Sach has medical conditions related to his left foot that affect his balance, Corrections Officer Maybury kicked at Van Sach's left foot while he was walking barefoot, in restraints, through the cold. Lieutenant Erskine (Corrections Officer

-23-

Maybury's supervisor), Corrections Officer Young, and certain John Doe Defendants knew of Corrections Officer Maybury's conduct and did nothing to stop him.

137. The injuries that Van Sach sustained from the wrongful application of four-point restraints by Defendants and Corrections Officer Maybury kicking his foot were so obvious that even a lay person would easily recognize them.

138. In failing to loosen the restraints, despite Van Sach's repeated pleas to do so, or to request medical assistance on his behalf, Defendants were deliberately indifferent to Van Sach's serious medical needs in that each of them knew Van Sach was in serious pain from the misapplication of four-point restraints and needed immediate relief from this pain and suffering through the loosening of the restraints. Each of them had the power both to grant this relief and seek medical assistance on Van Sach's behalf, yet they chose not to do so.

139. In kicking Van Sach's foot while he walked in restraints, Corrections Officer Maybury was deliberately indifferent to Van Sach's serious medical needs in that he knew he was taking a substantial risk of seriously injuring Van Sach.

140. In failing to prevent Maybury from kicking Van Sach's foot while he walked in restraints, Lieutenant Erskine, Corrections Officer Young, and certain John Doe Defendants were deliberately indifferent to Van Sach's serious medical needs in that each knew they were taking a substantial risk of seriously injuring Van Sach.

141. As direct and proximate results of the Corrections Officer Defendants' violations of Van Sach's constitutional rights, Van Sach unnecessarily suffered, and continues to suffer from, enduring physical and emotional injuries, causing him damages in an amount to be proven at trial.

**<u>Prayer for Relief</u>**

**WHEREFORE**, Plaintiff Joseph Van Sach respectfully requests that this Honorable Court grant him the following relief:

-24-

A.  Enter a judgment in favor of Van Sach and against Defendants, as requested herein, on each of the Counts in Van Sach's Fourth Amended Complaint;

B.  Award Van Sach his actual and consequential compensatory damages as a result of Defendants' violations of the Eighth Amendment, in an amount to be proven at trial;

C.  Award Van Sach punitive, multiple, and/or exemplary damages for Defendants' intentional, extreme, willful and wanton conduct and callous indifference to Van Sach's federally protected rights, in an amount to be proven at trial;

D.  Award Van Sach his reasonable attorneys' fees and costs pursuant to and as limited by applicable law;

E.  Award Van Sach pre-judgement and post-judgment interest pursuant to and as limited by applicable law; and

F.  Grant any other and further relief that the Court deems just and equitable.

**Jury Demand**

Plaintiff requests a trial by jury.

-26-

Dated:  February 10, 2022

Respectfully submitted,

*/s/* C. Vincent Maloney
C. Vincent Maloney (ARDC No. 06196631)
Perkins Coie LLP
131 South Dearborn Street
Suite No. 1700
Chicago, Illinois 60603-5559
Telephone: (312) 324-8400
Facsimile: (312) 324-9400
CVMaloney@perkinscoie.com

Richard Dvorak (ARDC No. 6269687)
Dvorak Law Offices, LLC
900 West Jackson, Suite 7E
Chicago, IL 60607
Telephone: (630) 568-3190
Richard.Dvorak@civilrightsdefenders.com

*Counsel for Plaintiff,*
*Joseph Van Sach (Reg. No. 17041-424)*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that in accordance with Federal Rule of Civil Procedure 5, Local Rule 5.5, and the General Order on Electronic Case Filing ("ECF"), the following document was served on February 10, 2022 through the district court's ECF system to all ECF filers, and by electronic mail to the following:

AUSA - Rockford
United States Attorney's Office (Rockford)
327 South Church Street
Rockford, IL 61101
(815) 987-4444
Email: usailn.ecfrockford@usdoj.gov

Prisoner Correspondence 8 - Internal Use Only
Email: ilnd_PC8@ilnd.uscourts.gov

/s/ C. Vincent Maloney

-27-